**Michael RATNER, for himself and all others similarly situated, Plaintiff,**

v.

**CHEMICAL BANK NEW YORK TRUST COMPANY, Defendant.**

**No. 69 Civ. 4195.**

United States District Court,
S. D. New York.

June 16, 1971.

See also D.C., 309 F.Supp. 983.

Jack Greenberg, Jonathan Shapiro, Eric Schnapper, New York City, for plaintiff.

Cravath, Swaine & Moore, New York City, for defendant; Howard G. Kristol, Richard S. Simmons, Richard M. Hirsch, New York City, of counsel.

## OPINION

FRANKEL, District Judge.

The central question in this case is whether defendant Bank violated the disclosure requirements of the Truth in Lending Act when it failed to show the "nominal annual percentage rate" of interest on a statement to plaintiff obligor under an "open end consumer credit plan," where the statement showed an outstanding balance but no finance charge yet incurred so that no interest rate had yet been applied. (This involved statement of the question and its terms of art should become intelligible as we proceed.) Other questions now before the court are (1) whether, assuming a failure of adequate disclosure, the plaintiff before us is entitled to sue, and (2) whether defendant Bank is absolved because, if there was a violation, it was "not intentional." Finally, the parties have agreed, with the court's concurrence, to postpone for the time being questions as to whether the case may proceed as a class action and as to the amount of plaintiff's recoverable costs and legal fees if he is entitled to such recovery.

Now before the court are defendant's motion to dismiss and plaintiff's motion for summary judgment. Upon the study of an extensive stipulation and the long, scholarly briefs for both sides, the court concludes that the facts deemed material are undisputed; that the issues ripe for decision should be resolved in plaintiff's favor; and that further submissions on the postponed issues must precede, and determine the nature of, the summary judgment to be entered for plaintiff.

I.

The Truth in Lending Act (hereinafter "The Act") is Title I, 15 U.S.C. § 1601 et seq. of the Consumer Credit Protection Act of May 29, 1968, 82 Stat. 146. Under the Act an "open end credit plan" is one "prescribing the terms of credit transactions which may be made thereunder from time to time and under the terms of which a finance charge may be computed on the outstanding unpaid balance from time to time thereunder." [1] As everyone knows who has not sojourned lately in a cave, plans of this kind have proliferated widely in the last few years. The parties here are contractually related under one of these, known as a Master Charge Card Agreement.[2]

Under this Agreement, as is commonly the case with such plans, the cardholder may use his card to purchase goods and services and/or to borrow money, and he may at any time repay all or any part of his outstanding indebtedness. The Bank [3] sends the cardholder at the end of each month (or "billing cycle") a statement setting forth, among other things, the indebtedness outstanding at the beginning of the month ("previous balance"), all charges and credits to the account during the month (including finance charges, if any, incurred during the month) and the indebtedness outstanding at the end of the month ("new balance").

---

1. § 103(i) of the Act, 15 U.S.C. § 1602 (i) (Supp. V).

2. The writer of this opinion also has such a card. When this was raised with counsel on the return day of the motion, all agreed that it might entail a long search these days to find a judge not similarly conflicted. It was concluded without dissent that the search should

not be made and that the motion should remain for decision in the hands to which a number of adjournments had brought it.

3. The reference here and hereafter is to defendant, but the practices described, and the statutory requirements, are similar for other open end credit plans.

Under plans of this type generally, the cardholder may incur a service or finance charge in connection with any extension of credit, and this may be computed as a minimum charge, a percentage of the outstanding indebtedness or in other ways. Under the Master Charge plan, where the cardholder borrows money, he incurs a finance charge from the date the indebtedness is contracted.[4] For purchases of goods and services, however, the cardholder incurs no finance charge until the 26th day after the "billing date" shown on the statement which first reflects the indebtedness. In other words, if the indebtedness is paid in full before the expiration of the 25-day grace period (called, naturally, the "free ride"), there is no finance charge.

The Act imposes an array of disclosure requirements to further the objective of "truth in lending"—"so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit."[5] Among other things, the creditor under an open end plan, before opening an account, must disclose to the prospective obligor, "to the extent applicable," the conditions for imposing finance charges, the length of any free-ride period, the method of determining finance charges, the periodic rate for computing finance charges, and "the corresponding nominal annual percentage rate determined by multiplying the periodic rate by the number of periods in a year."[6] It is not disputed that the Agreement in this case complied with these requirements.

Once an open end account is created, the creditor must send the obligor, "for each billing cycle at the end of which there is an outstanding balance in that account or with respect to which a finance charge is imposed, a statement setting forth" a number of prescribed items of information. The full provision governing such periodic statements central in the present dispute, is given here in a footnote.[7] For his charge of

---

4. No such transaction is involved in the case. The provision is mentioned to round the picture and because, in defendant's view, it has some possible bearing upon the specific question in controversy.

5. Act § 102, 15 U.S.C. § 1601 (Supp. V) ("Findings and declaration of purpose").

6. Id. § 127(a), 15 U.S.C. § 1637(a) (Supp. V).

7. Id. § 127(b), 15 U.S.C. § 1637(b) (Supp. V) :

"The creditor of any account under an open end consumer credit plan shall transmit to the obligor, for each billing cycle at the end of which there is an outstanding balance in that account or with respect to which a finance charge is imposed, a statement setting forth each of the following items to the extent applicable:

(1) The outstanding balance in the account at the beginning of the statement period.

(2) The amount and date of each extension of credit during the period, and, if a purchase was involved, a brief identification (unless previously furnished) of the goods or services purchased.

(3) The total amount credited to the account during the period.

(4) The amount of any finance charge added to the account during the period, itemized to show the amounts, if any, due to the application of percentage rates and the amount, if any, imposed as a minimum or fixed charge.

(5) Where one or more periodic rates may be used to compute the finance charge, each such rate, the range of balances to which it is applicable, and, unless the annual percentage rate (determined under section 1606(a) (2) of this title) is required to be disclosed pursuant to paragraph (6), the corresponding nominal annual percentage rate determined by multiplying the periodic rate by the number of periods in a year.

(6) Where the total finance charge exceeds 50 cents for a monthly or longer billing cycle, or the pro rata part of 50 cents for a billing cycle shorter than monthly, the total finance charge expressed as an annual percentage rate (determined under section 1606(a) (2) of this title), except that if the finance charge is the sum of two or more products of a rate times a portion of the balance, the creditor may, in lieu of disclosing a single rate for the total charge,

an unlawful omission, plaintiff relies on paragraph "(5)," which for convenience we remove from its vital setting and repeat here in text, italicizing the words central to his thesis:

"Where one or more periodic rates may be used to compute the finance charge, [the statement is to set forth] each such rate, the range of balances to which it is applicable, and, unless the annual percentage rate (determined under section 1606(a) (2) of this title) is required to be disclosed pursuant to paragraph (6), *the corresponding nominal annual percentage rate determined by multiplying the periodic rate by the number of periods in a year.*"

The periodic statement sent by defendant Bank to plaintiff for the monthly period ending September 15, 1969, disclosed an outstanding indebtedness of $111.41 at the beginning of the period (approximately August 15, 1969); that this amount had been paid during the free-ride period so that it had given rise to no finance charge; that plaintiff had acquired a new indebtedness of $191.58 for purchases during the monthly period (the "new balance"); and (in a line of type under the new balance), a legend and an arrow pointing to the "new balance" and indicating "no additional finance charges if [this total of $191.58 was] paid in 25 days from bill date." [8]

On the far right, on the other hand, the statement indicated as a "minimum payment" the sum of $10.00, explained on the back of the form (and in accordance with the Agreement) as the payment required "to avoid delinquency." Although no finance charge had been incurred during the period covered by the statement, but in seeming compliance with § 127(b) (5) of the Act, the statement reported three periodic (monthly) percentage rates: 1.50% for purchases up to $500, 1.00% for purchases over $500, and 1.00% for cash advances. However,—and here we reach the point of the case—no "annual percentage rate" of any kind was shown.

Plaintiff sent defendant the minimum payment of $10.00. It appears that plaintiff, on his next statement, was billed for a finance charge.[9] In the meantime, on September 24, 1969, plaintiff filed the complaint instituting the present lawsuit. His ultimate contention is, in the language of the complaint, that "[d]efendant's monthly statement to plaintiff in September 1969, violated the Act and the implementing Regulation, 12 CFR 226.7, in that it failed to disclose the annual percentage rate or the nominal annual percentage rate." We proceed to that central topic.

---

disclose each such rate expressed as an annual percentage rate, and the part of the balance to which it is applicable.

(7) At the election of the creditor, the average effective annual percentage rate of return (or the projected rate) under the plan as prescribed in subsection (a) (5) of this section.

(8) The balance on which the finance charge was computed and a statement of how the balance was determined. If the balance is determined without first deducting all credits during the period, that fact and the amount of such payments shall also be disclosed.

(9) The outstanding balance in the account at the end of the period.

(10) The date by which, or the period (if any) within which, payment must be made to avoid additional finance charges."

8. The actual statement is reproduced as an Appendix to this opinion.

9. Strictly speaking, this has not been alleged in the complaint or "proved." It is hard to believe, however, that it is a matter the parties would now want to dispute as an obstacle to summary judgment. If either side does wish to dispute it, the court should be notified of that desire within 10 days after publication of this opinion, in which event the court will proceed to some expeditious mode of resolving what is obviously an easy subject of documentary evidence. The matter should be thus put to rest to avoid bothersome excursions if there is an appeal. As will appear, however, in the view this court takes, despite defendant's arguable grounds for a different view, the matter is quite immaterial.

## II.

■ A. To begin with the statutory language most directly in issue, § 127(b) (5) (note 7, *supra*) appears literally to require the kind of disclosure defendant omitted—and, specifically, disclosure of the "nominal annual percentage rate" of 18% for the category of purchases under $500.[10] Defendant attacks this literal reading by referring to the introductory words of the subsection, which say that the items listed are to be disclosed "to the extent applicable." No "nominal annual percentage rate" was "applicable," defendant says, because there was no finance charge for the period covered by the statement. Hence, no "rate" of any kind "applied." (Defendant did show the "monthly periodic rate," which was not "applied" to the statement in question. Despite defendant's attempted explanation, which the court considers elsewhere, this seeming anomaly remains to haunt and undermine a substantial portion of defendant's contentions.) Expanding on this in a Reply Memorandum, defendant argues that § 127(b) of the Act, concerning periodic statements, was designed to require an historical account of things that had actually happened, as contrasted with § 127(a), governing the opening Agreement and its disclosures. It is worth noting that under defendant's reading, the nominal annual percentage rate would never have to be disclosed on the monthly statement—making § 127(b) (5) meaningless—because it is, by definition, never "applied" in the sense plaintiff means. But even apart from that, the argument is weak as a matter of dictionary English and utterly limp as a matter of construction of the statute and its patent purposes.

The word "applicable" is hardly confined in meaning to what has been or is being "applied." It means, to use the dictionary only as a preliminary reference, not a legal authority:

"Capable of being applied; fit, suitable, or right to be applied; having relevance; as, this observation is *applicable* to the case under consideration." [11]

To illustrate the nature and signification of this usage, we need look no farther than the subsection defendant invokes, § 127(a), governing the so-called "prospective" disclosure made when nothing has yet happened, everything is "unknown," nothing is being applied, and, therefore, in defendant's parlance, nothing is "applicable." Subsection (a) uses the same words: it lists the items to be disclosed "to the extent applicable." And it lists, *inter alia*, both the periodic rates "and the corresponding nominal annual percentage rate * * *."

Clearly, "applicable" means "relevant" under the plan or statement in question. And that—when the plaintiff faced a finance charge if he chose to accept defendant's invitation to pay only the $10 minimum, and take the credit—was exactly the case for both the periodic rate defendant did show and the annual rate it omitted.

The characterization of § 127(b) as "historical" is demonstrably wrong in at least one other respect. Looking strictly to the future, the tenth item required to be shown (as defendant showed it) is the "date by which, or the period (if any) within which, payment must be made to avoid additional finance charges." [12]

10. That "nominal" rate, it will be recalled, is derived by multiplying the monthly periodic rate (1.50% for purchases under $500) by the number of months in a year.

11. Webster's Second Edition (1950). Webster's Third, however it swings elsewhere, makes no changes of substance in this.

12. In an earlier phase of this litigation, where "[t]he merits of this controversy [were] not before the court," Judge Cannella gave the pertinent language the same reading it receives in this decision. As he saw the matter, 15 U.S.C. § 1637 (b) lists information (including the annual percentage rate) which must be disclosed "for each billing cycle at the end of which there is an outstanding balance in that account or with respect to which a finance charge is imposed * * *";

But there are grounds more profound than these semantical ones for rejecting defendant's view. The thrust of the Act and its fundamental weapon of compelled disclosure is "prospective." Its purpose is to put the borrower in possession of the pertinent information before the plunge, so that he may know and intelligently compare his options. This appears at the outset in the findings and declaration of purpose, § 102, 15 U.S.C. § 1601 (Supp. V):

> "The Congress finds that economic stabilization would be enhanced and the competition among the various financial institutions and other firms engaged in the extension of consumer credit would be strengthened by the informed use of credit. The informed use of credit results from an awareness of the cost thereof by consumers. It is the purpose of this subchapter to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit."

Throughout the legislative process of achieving truth in lending, this was the general theme, and it is at war with defendant's position. Relevant legislative history shows that Congress expected the monthly statement to make people like the plaintiff aware of their credit options. They were to have, prospectively, not only the monthly rate (which defendant gave), but the annual rate also, so they could compare it with rates of other lenders, savings bank interest rates, etc. (commonly given as annual, not monthly, rates), before deciding whether to accept the invitation to take credit from defendant, shop other lenders, or draw money from savings accounts to pay off the indebtedness. There is nothing in the legislative history showing any purpose to exempt monthly statements not imposing finance charges from the basic annual rate disclosure requirement.

Earlier versions of the bill, although more limited in disclosure requirements than the final enactment, all had as their fundamental purpose to serve this "prospective" need. Thus, the basic purpose of the Senate bill (S. 5) was stated as being to "permit consumers to compare the cost of credit among different creditors and to shop effectively for the best credit buy." S.Rep. No. 392, 90th Cong., 1st Sess. 1 (1967). House Report No. 1040, 90th Cong., 1st Sess. 7, 13 (1967), U.S.Code Cong. & Admin. News 1968, p. 1962, of the Committee considering H.R. 11601 repeated the aim to "permit the consumer to 'comparison shop' for credit" by "requiring all creditors to disclose credit information in a uniform manner * * * [giving] the American consumer * * * the information he needs to compare the cost of credit and to make the best informed decision on the use of credit." A minority of House Committeemen, whose views on specific disclosure requirements for revolving credit were eventually adopted by the entire House, reported that "the purpose [of the House Bill] is to assure to the consumer sufficient, clearly understandable and readily comparable information to enable him to measure various types of consumer credit proposals with one another and then decide, with reasonable accuracy, which offer is more suitable to his economic situation, or a better buy, or whether he should dip into his savings or make other arrangements to avoid using credit in a particular situation." *Id.* at 106. The general focus, then, is on making various credit options known and understandable to the consumer, before he decides among them; and this is the reason for requiring disclosure of an annual rate on the monthly statement, which, of course, is a proposal to accept

---

since these phrases "are in the disjunctive and not the conjunctive * * *, upon either condition the information would be required to be set forth." Rat-

ner v. Chemical Bank New York Trust Company, 309 F.Supp. 983, 988 n. 10 (S.D.N.Y.1969).

credit and not pay in full the New Balance. Implementing this objective, the bill that finally emerged from Conference required an annual rate of some type to be disclosed on each monthly statement, including statements not actually applying any rate. According to the Conference Report:

"In any statement of an account under an open end plan under which a rate may be used to compute the finance charge (even though, for the particular month, the rate may yield a charge below the minimum and thus be inapplicable) the creditor must state the periodic rate and the 'nominal' annual percentage rate determined by multiplying the periodic rate by the number of periods in a year." H.Rep. No. 1397, 90th Cong., 2d Sess. 27 (1968), U.S.Code Cong. & Admin.News 1968, p. 2024.

The compromise reached in Conference concerned only the methods to be used in computing the annual rate disclosed.[13] But, as Congressman Wright Patman reported back to the House from the conference, "[W]e have maintained our basic position of annual rate disclosure on revolving charge accounts." 114 Cong. Rec. 14384 (1968).

The history, in sum, is, like the statutory language on its face, compellingly favorable to plaintiff's position.

■ B. Defendant moves to more promising, but eventually infirm, ground when it invokes the Federal Reserve Board's Regulation Z, 12 CFR 226.[14] In pertinent part, the Regulation says, § 226.7:

"[T]he creditor of any open end credit account shall mail or deliver to the customer, for each billing cycle at the end of which there is an outstanding

13. The Senate bill, as amended in Committee, exempted most revolving credit plans from the annual rate disclosure requirement. The House Banking and Currency Committee, by bare majority, had carved a similar exception in H.R. 11601. See H.R.Rep.No.1040, 90th Cong., 1st Sess. 13–17, 107–115 (1967). On the House floor, however, the original wording of H.R. 11601 was restored, and the annual percentage rate disclosure requirement was applied to open end credit. (Defendant's attempt to interpret H.R. 11601 as requiring annual rate disclosure only on monthly statements imposing a finance charge is based on its repeated argument that "finance charge" means the finance charge "applied" during the previous billing period—a construction no more acceptable in this context than elsewhere.) The compromise reached by the Senate and House Conferees distinguished between the kinds of annual rate that had to be disclosed, but required either a nominal or actual rate on all monthly statements. And so Senator Proxmire, the sponsor of the Senate bill, reported back to his colleagues that "[t]he effect of the conference provision is to permit creditors to disclose a nominal annual percentage rate equal to 12 times the monthly rate on all monthly statements, as long as minimum or fixed charges authorized by State law did not exceed 50 cents. If State law

permitted minimum charges in excess of 50 cents and if the creditor applied such minimum charges, he would be required to annualize such charges and to disclose the resulting rate on each monthly statement." 114 Cong.Rec. 14489 (1968). Although one of the conferees' chief areas of concern appears to have been how to "annualize" a fixed minimum finance charge, there is nothing in the history to suggest that in cases where no finance charge had been imposed for the billing period, creditors were to be exempted altogether from the basic requirement of disclosing annual rates on all monthly statements. See also Remarks of Representative Sullivan, co-sponsor of the House bill, 114 Cong.Rec. 14386 (1968).

14. § 105 of the Act, 15 U.S.C. § 1604 (Supp. V), says:
"The [Federal Reserve] Board shall prescribe regulations to carry out the purposes of this subchapter. These regulations may contain such classifications, differentiations, or other provisions, and may provide for such adjustments and exceptions for any class of transactions, as in the judgment of the Board are necessary or proper to effectuate the purposes of this subchapter, to prevent circumvention or evasion thereof, or to facilitate compliance therewith."

debit balance in excess of $1 in that account or with respect to which a finance charge is imposed, a statement or statements which the customer may retain, setting forth * * * each of the following items to the extent applicable:

\* \* \* \* \* \*

(5) Each periodic rate, using the term 'periodic rate' (or 'rates'), that may be used to compute the finance charge (whether or not applied during the billing cycle), and the range of balances to which it is applicable.

(6) The annual percentage rate or rates determined under § 226.5(a), using the term 'annual percentage rate' (or 'rates'), and, where there is more than one rate, the amount of the balance to which each rate is applicable. \* \* \* "

The fragment defendant takes as a weapon from this is the parenthetical phrase in paragraph (5), "(whether or not applied during the billing cycle)." There is no such phrase in paragraph (6). So, it is argued, the nominal annual rate is not required to be given, as it is under paragraph (5) in the corresponding statutory subsection "whether or not applied during the billing cycle." But omitting arguments about excluded middles, the point is not valid. The Regulation, like the statute, reflects that "applicable" and "applied" are not the same words. It nowhere says that the nominal annual rate should be omitted, but a periodic rate included, when there is no finance charge to which either is being "applied." The Federal Reserve draftsmen appear to have done no more than attempt a useful simplification, but perhaps at the cost of some confusion, when they undertook to shorten and streamline the thoughts spread out through paragraphs (5) and (6) of the statutory subsection.

Above all, defendant's analysis does not lead to a sensible result. There is no justification in the statutory purpose for requiring inclusion of the periodic rate and omission of the annual rate on the kind of occasion here in question—when neither has been or is being "applied." The reasons for giving either, already outlined, apply equally to both. Indeed, there is much to be said for the view that if only one were to be given, it should be the annual, more useful for comparisons, not the monthly periodic rate. But the statute requires both. The language of the Regulation embraces both. It would take much more than a possibly missing parenthesis to persuade that the Board meant to alter the statute in the (probably impermissible) fashion defendant suggests.

C. Two months after the present suit was instituted, an attorney for the Federal Reserve Board, apparently responding to an inquiry from a bank,[15] wrote a letter on the subject which concerns us. He wrote exclusively in terms of the Board's Regulation, § 226.7(b) (6), making no reference to the statute and evidently failing even to integrate § 226.7 (b) (6) with § 226.7(b) (5) of the Regulation. With this straitened view, he reached the conclusion "that § 226.7 (b) (6) does not require disclosure of [an annual rate] for the [billing] cycle in the absence of [finance] charges." There is much debate in the papers now about the weight to be given to this attorney's opinion. It is not, and is not claimed to be, the position of the Board itself. The parties, after a flurry of epistolary sparring, have each gotten, and given the court, closely similar letters from the Board's Deputy Secretary

15. The letter is before this court in excerpted form, with a blank where the addressee's name appeared. Defendant, quarreling with plaintiff about this, says there is "no basis for plaintiff's assertion that the letter was written in response to a request from counsel for a bank." However that may be, the inquiry to which the Board's attorney responded (appended to defendant's answering memorandum here) refers to its concern for "the bank in question," and it is not important whether the concern was conveyed by a lawyer or some other advisor.

about the protocol of all this. That official says, not surprisingly, that a letter from any particular official like the attorney in question "represents the informed view of the particular official * * *." He goes on in his letter to defendant's counsel to say:

"It is the Board's view that the public is entitled to rely on a formal staff opinion unless and until it is altered by the Board after formal consideration. Where the issue involves a statement of legal position, it may be assumed that while the question discussed has not been presented to, nor reviewed by the Board, such view is believed by the staff to be legally sound and judically [sic] sustainable, and would be recommended by the staff for Board adoption should the matter be presented to the Board. However, in view of the pending litigation involving the issue discussed in the staff letter of November 28, 1969, the Board deems it inappropriate to examine at this time the opinion contained in that letter and therefore is not able to comply with your request."

The upshot of all that is briefly stated: defendant disclaims reliance on the Board attorney's letter as the basis for its initial (since altered, see *infra*) practice of not disclosing annual rates in the absence of a finance charge. On its merits, the attorney's letter is a brief, conclusory statement rested upon what this court, with deference, finds to be insufficient analysis of the pertinent materials. Without discoursing at length on its "weight," the position it espouses has been rejected.

D. Scattered through defendant's earnest and skillful arguments is the assertion that an *actual* "annual percentage rate" cannot be computed when there has been no finance charge and that "[u]nder some open end credit plans" disclosure of a "nominal" rate "would be seriously misleading to a cardholder." The answer is (1) the statute calls for the "nominal" rate and (2) defendant, whatever may be true

under "some" plans, has for a long time (though after this lawsuit began) been giving annual percentage rates of the kind plaintiff claims are required. In a letter to the Federal Reserve Board, a copy of which has been filed with the court, defendant explained that this altered practice, coinciding with what plaintiff says the statute requires, came about when (1) "the concern that provides computer services to Chemical offered to print * * * an annual percentage rate on all its periodic statements"; (2) Chemical said not to do it; (3) "the computer concern * * * inadvertently" did it anyhow; (4) Chemical "discovered [this] for the first time" several months after giving the contrary instructions; and (5) "Chemical concluded, after some deliberation, that it would be disruptive and possibly confusing to its cardholders to have its program altered again.". So the annual rates plaintiff demands are being disclosed, presumably without strain and without misleading cardholders. Whatever chilling things all this tells about our prospects in the computer dynasty, it dissipates many of the fears and troubles defendant hypothesizes as answers to plaintiff's claim.

### III.

The basis for plaintiff's claim and the court's jurisdiction over it is § 130 of the Act, 15 U.S.C. § 1640 (Supp. V), which provides:

"(a) Failure to disclose.

Except as otherwise provided in this section, any creditor who fails in connection with any consumer credit transaction to disclose to any person any information required under this part to be disclosed to that person is liable to that person in an amount equal to the sum of

(1) twice the amount of the finance charge in connection with the transaction, except that the liability under this paragraph shall not be less than $100 nor greater than $1,000; and

(2) in the case of any successful action to enforce the foregoing liability, the costs of the action together with a reasonable attorney's fee as determined by the court.

\* \* \* \* \* \*

"(c) Unintentional violations; bona fide errors.

A creditor may not be held liable in any action brought under this section for a violation of this part if the creditor shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.

\* \* \* \* \* \*

"(e) Jurisdiction of courts.

Any action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation."

Defendant argues that, assuming it violated the disclosure requirements, plaintiff's suit must be dismissed on one or more of three independently sufficient grounds:

A. That "plaintiff did not incur any finance charge in connection with the transaction which gave rise to the alleged violation \* \* \*."

B. Defendant has a "good faith defense" because it relied upon the advice of counsel in not disclosing annual rates.

C. "Recognized principles of common and constitutional law preclude the imposition of a civil penalty in this action."

The court has concluded that none of these points should be sustained.

■ A. It is plain from the language and sense of § 130 that the basis for the liability is the creditor's failure "to disclose to any person any information required \* \* \* to be disclosed \* \* \*." The "finance charge in

connection with the transaction" enters the picture thereafter as a starting-point for the computation of damages. There is no requirement that the plaintiff prove he himself was deceived. There is no requirement that he should have been led by the deception to pay the "finance charge in connection with the transaction \* \* \*."

■■ The scheme of the statute, as both sides agree, is to create a species of "private attorney general" to participate prominently in enforcement. The language should be construed liberally in light of its broadly remedial purpose. Thus construed, it plainly encompasses this suit. As plaintiff demonstrates in detail, but this court finds it sufficient to note briefly, the omission with which defendant is charged occurred "in connection with [a] consumer credit transaction \* \* \*." The fact that there was no finance charge *at the time* of the omission is of no consequence. The fact that there might never be one (i. e., if despite defendant's invitation to pay only $10 and incur a finance charge, plaintiff paid the whole balance and incurred none) is also unimportant, as is the fact that plaintiff actually did thereafter incur and pay such a charge. It is sufficient for present purposes that (1) there was a readily knowable "finance charge in connection with the transaction," and (2) this relatively trivial detail serves, after all, not as the *ground for liability* but merely as the initial step in what defendant accurately calls the statute's "sole measure of damages."

Beyond using the finance charge as such an available and handy reference point, presumably to be replaced in the normal case by the $100 minimum or $1,000 maximum, Congress made clear its broader scheme, and broader system of reimbursement, for private enforcement. It invited people like the present plaintiff, whether they were themselves deceived or not,[16] to sue in the public interest. Following familiar precedents, it

---

16. Realistically, the plaintiffs in such cases are likely to be people not easily or actually deceived.

encouraged such actions by providing, in addition to the incentive of public service, costs and a reasonable attorney's fee above the minimum recovery of $100. Cf. Newman v. Piggie Park Enterprises, 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968).

The essential purpose seems manifest. This action is manifestly within it. The most that may be required to cope with defendant's parsing of the statutory language is that the courts may have to scale creative heights occasionally to fix the measure of damages without having an imposed finance charge as a nominal springboard (though even that is unnecessary here). This is not only within the range of judicial competence. It is the compelled alternative to telling Congress we will ignore what was validly sought because the grammar, though entirely adequate, could be better. Johnson v. United States, 163 F. 30, 32 (1st Cir. 1908) (Holmes, J., on Circuit).

B. We come to what defendant tenders as its "good faith defense," under the provision, in § 130(c) of the Act, 15 U.S.C. § 1640(c), absolving from liability a creditor who shows that his "violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." The briefs range widely and learnedly on this. Enlightened by these efforts, the court deals briefly with the subject here.

■ It is undisputed that defendant carefully, deliberately—intentionally—omitted the disclosure in question. That defendant, in this court's view, mistook the law does not make its action any less intentional. This is normally true in criminal cases. United States v. International Minerals & Chemical Corp., 402 U.S. 558, 563, 91 S.Ct. 1697, 1699, 29 L.Ed.2d 178 (1971); Horning v. District of Columbia, 254 U.S. 135, 137, 41 S.Ct. 53, 65 L.Ed. 185 (1920); Ellis v. United States, 206 U.S. 246, 257, 27 S.Ct. 600, 51 L.Ed. 1047 (1907); United States v. Gris, 247 F.2d 860, 865 (2d Cir. 1957); Braswell v. United States, 224 F.2d 706, 710 (10th Cir. 1955); see United States v. Custer Channel Wing Corporation, 376 F.2d 675, 680–682 (4th Cir. 1967). It is surely the law here.

■ This conclusion is buttressed when we note the requirement in the defensive subsection that the error be shown to have been both "not intentional and [the result of] a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." The sparse legislative history on this reinforces what the language shows amply by itself—that the absolution was meant for clerical errors.[17] A defendant invoking this excuse is required not merely to show the clerical error was unintentional, but also that due care has been taken to set up *procedures* to avoid it. The provision is wholly inapposite to deal with errors of law like defendant's, though made in en-

17. The original version of the Senate bill contained no exemption for unintentional or bona fide violations. After businessmen and others complained during the Senate hearings that mathematical and clerical errors would be inevitable because of the complexity of annual rate computations, Hearings on S. 5 Before the Subcomm. on Financial Institutions of the Senate Comm. on Banking and Currency, 90th Cong., 1st Sess. 64 ff., 226, 374, 426–427, 529, 584, 698 (1967), and should not subject creditors to liability, *id.* at 374, the bill was changed to include the language of the present exemption

—with additional provision for exemption where the error is corrected and adjustments made "within fifteen days after discovering the error, and prior to the institution of an action hereunder or the receipt of written notice of the error."

The House bill originally required proof of a "knowing" violation to establish civil liability. This was omitted in the final House version, apparently in response to objections by the Justice Department that to require proof of "specific knowledge" might "frustrate prospective plaintiffs, and thereby weaken the enforcement pro-

tire "good faith." [18] However much clients and others might wish it, nobody has devised—and defendant omits to mention—"procedures" Congress could have envisaged to cover such errors of law.

■ C. Finally, defendant argues that its interpretation of the statute was at a minimum "reasonable," and that it may not be subjected to a "penalty" for what is now held to have been a mistake of this nature. For the moment, subject to reconsideration when the question of class-action treatment is confronted, this argument may be rejected speedily. Granting that slogans on such subjects too often do service for analysis, the "remedial" character of the provision for civil recoveries quite overwhelms its allegedly "penal" aspect. Cf. Rex Trailer Co. v. United States, 350 U.S. 148, 76 S.Ct. 219, 100 L.Ed. 149 (1956). Damages are liquidated, to be sure, but there is an effective upper as well as lower limit. Cf. Bostwick v. Cohen, 319 F. Supp. 875 (N.D.Ohio 1970). The aim to protect consumers is the paramount aspect of the statute; the countenancing of "reasonable" violations would be grossly subversive of that. There are explicitly penal sanctions for the "unreasonable" violator who behaves "willfully and knowingly * * *." § 112, 15 U. S.C. § 1611 (Supp. V). And for now, at any rate, we are concerned with only a single plaintiff, suing within a tight (one-year) statute of limitations, § 130(e), 15 U.S.C. § 1640(e) (Supp. V), and likely to recover a sum paltry by any pertinent standard. While the contexts differ, this court follows the only previously reported decision in holding the provision for civil recoveries "remedial" rather than "penal." Bostwick v. Cohen, *supra*.

To summarize, then, the court will deny the motion to dismiss and grant plaintiff's motion for summary judgment. As noted earlier, however, the entry of a final judgment or order will await disposition of the questions thus far postponed. The court will schedule for the near future such further briefs and argument as may be deemed appropriate for the remaining problems.

## APPENDIX
## MOORE BUSINESS FORMS, INC. S

visions of the act." Hearings on H.R. 11601 Before the Subcomm. on Consumer Affairs of the House Comm. on Banking and Currency, 90th Cong., 1st Sess., pt. 1, 903 (1967).

18. It merits emphasis anyhow that the words "good faith" are defendant's, not from the statute.