Isidoro **BERKMAN** et al., Plaintiffs,

v.

**SINCLAIR OIL CORPORATION**, a Delaware corporation, and Atlantic Richfield Company, a Pennsylvania corporation, Defendants.

Civ. A. Nos. 69 C 2055, 69 C 2320.

United States District Court,
N. D. Illinois, E. D.

March 8, 1973.

Lieberman, Levy & Baron, Chicago, Ill., for plaintiffs.

Robert J. Vollen, of Schiff, Harden, Waite, Dorschel & Britton, Aaron J. Kramer, Chicago, Ill., for defendants.

BAUER, District Judge.

## MEMORANDUM OPINION AND ORDER

This cause comes on the defendants' motion that the instant suit not proceed as a class action.

This action arises under Section 130(a) of Title I, the Truth in Lending Act ("Act"), of the Consumer Credit Protection Act (15 U.S.C. § 1601 et seq.). This Court has jurisdiction under Section 130(e) of the Act.

The named plaintiffs are Isidoro Berkman, Gary M. Adelman and Jack Zaban who all reside in the Northern District of Illinois. The defendants are Sinclair Oil Corporation ("Sinclair") and Atlantic Richfield Company ("Atlantic"), both retailers of petroleum products. Sinclair is a Delaware corporation licensed to do business in Illinois. Atlantic is a Pennsylvania corporation licensed to do business in Illinois.

The plaintiffs allege that Sinclair is a wholly owned subsidiary of Atlantic, and that Atlantic operates a portion of its business under the name "Sinclair Oil Corporation".

The instant action is a consolidation of two cases. The plaintiffs in the Second Amended Complaint which consolidates the pleadings of the prior cases allege that defendants violated the Truth in Lending Act (15 U.S.C. § 1601 et seq.) and Regulation Z (12 C.F.R. § 226) promulgated thereunder.[1]

The instant action is a class action. The named plaintiffs claim to represent themselves and the class of all other persons similarly situated to whom defendants have extended consumer credit during the period in question under an alleged open-end credit plan.[2] Berkman, Adelman and Zaban seek a judgment herein for themselves and all other members of the alleged class in the following amounts:

"(a) In an amount equal to the sum of twice the amount of the finance charge, as defined in the Act, in connection with each of said consumer credit transactions, except that the judgment with respect to each of said consumer credit transactions should not be less than $100.00 nor greater than $1,000.00, all as provided by Section 130(a)(1) of the Act; and

(b) In an amount equal to the costs of this action together with reasonable attorneys' fees, as provided by Section 130(a)(2) of the Act, which attorneys' fees shall be paid to plaintiffs' attorneys."[3]

The named plaintiffs allege that the following transactions give them standing to represent the alleged class:

1. On August 28, 1969, plaintiff Berkman in connection with a consumer credit transaction, charged to his credit card $6.35 for gasoline sold by one of defendants'

---

1. More specifically, the plaintiffs allege a violation on the forms mailed to defendant's credit card holders (including the named plaintiffs) between July 1, 1969, which was the effective date of the Act, and October 6, 1969 and November 7, 1969 when Berkman and Adelman filed their respective original complaints.

The named plaintiffs are holders of defendants' gasoline credit cards and have purchased services and/or products from defendants' dealers. Plaintiffs have charged these purchases with the credit cards which defendants have issued to each of them.

Under defendants' credit card operations, each credit card customer who does not pay his bill in full within 60 days from the initial billing date is assessed a month-

ly 1½% charge by the defendant. This charge is also imposed at the end of each subsequent month until the account is paid in full.

In each month between July 1, 1969 and March 1, 1970, defendants mailed the identical form of monthly billing statements to each of their Mid-Continent credit card customers. Plaintiffs allege that the disclosures contained in these monthly statements and the accompanying supplementary material did not meet the requirements of the Act and Regulation Z.

2. Second Amended Complaint, Count I, paragraph 4.

3. Second Amended Complaint, Count I, paragraph 13.

dealers (2nd Amended Complaint, paragraph 7). This $6.35 charge was first reflected as a current charge on defendants' monthly billing statement dated September 15, 1969. The billing statement of October 14, 1969 also reflected the $6.35 charge as a "previous balance".[4]

2. On or about July 15, August 18, September 16, October 15, and November 16, 1969, respectively, defendants mailed to plaintiff Zaban credit card billing statements along with a "Notice to customers of late payment finance charge".[5] (2nd Amended Complaint, paragraph 11.)

3. On or about July 19 and October 18, 1969, respectively, defendants

mailed to plaintiff Adelman defendants' credit card statements dated July 14 and October 13, 1969.[6] (Second Amended Complaint, paragraph 10).

Defendants have 3,000,000 credit card holders nationwide. Pre-Trial discovery thus far has been limited to the defendants Mid-Continent Area where the defendants have over 500,000 credit card holders each of whom makes an average of four purchases with his credit card per month. An average of over 2,000,000 purchases are charged each month by defendants' Mid-Continent Area credit card holders to their accounts with defendants.

Neither Berkman nor Zaban ever incurred any "finance charge"[7] during

4. Berkman's deposition reveals that he next received a notice dated November 1, 1969 captioned "Important Notice—Past Due" which advised the plaintiff Berkman that he could "avoid a service charge of $.10 if payment of $6.35 is made promptly." On November 19, 1969, defendants wrote to Berkman advising that due to delinquency (more than 60 days past due) in his account, all credit privileges were revoked and asking that he return defendants' credit card and pay the $6.35 balance. On or about December 17, 1969, Berkman mailed a check to defendants in the amount of $6.45 in purported payment of the unpaid balance in his account. This check was cashed by defendants who, on February 17, 1970, advised Berkman by letter that he had overpaid his cancelled account by $.10. Defendants sent Berkman a check in that amount to compensate for this overpayment. Berkman's overpayment of $.10 to defendants was never actually assessed as a 1½% charge or otherwise on the $6.35 delinquent balance in his account; his payment of it was a unilateral act taken after defendants had twice advised him that his account was cancelled and that he should remit the $6.35 balance due on his account.

5. In plaintiff Zaban's deposition of November 6, 1970, he admitted that he had never been assessed or paid a finance charge assessed by defendants. Zaban further admitted that he was not misled

by certain of defendants' Truth in Lending disclosures in the disputed credit documents.

6. Plaintiff Adelman in his deposition stated that he used his card to charge purchases of products for his automobile which was used for both business and personal purposes. Between July 1, 1969 and November 20, 1969, Adelman incurred one service charge of $.28 on his account which appeared on his billing statement dated October 13, 1969. This $.28 charge was imposed because of Adelman's failure to pay his account balance with defendants for the month of August 1969. During August Adelman made current charges to his account of $18.60 which were reflected on his August and September monthly billing statements but not paid until on or about October 27, 1969 when he mailed a check in the amount of $43.79 ($43.51 product balance and $.28 service charge) to defendants. Adelman commenced this suit against defendants on November 7, 1969. On November 20, 1969 defendants cancelled Adelman's account and requested the return of his credit card and payment of his remaining balance with defendants.

7. See footnotes 4 and 5. The plaintiffs allege that the 1½% charge assessed by defendants on delinquent accounts with balances 60 days or more past due is a "finance charge". Plaintiffs further claim that because such a "finance charge" is assessed, defendants' credit card sys-

the period subsequent to the July 1, 1969 effective date of the Act. Thus the named plaintiffs apparently assert that each of defendants' credit card holders has a right to recover a minimum penalty of $100.00 for each consumer credit transaction without regard to whether any finance charge was assessed or paid.

If every purchase charged in the Mid-Continent Area alone to defendants' credit cards were determined to be a "consumer-credit transaction" under the Act, then the minimum class action recovery pursuant to the Act for the Mid-Continent Area alone would be over $200,000,000. per month ($100 x over 2,000,000 transactions, i.e. purchases per month).[8]

The defendants in support of their motion that this cause not proceed as a class action contend:

1. A class action is not superior to other available methods for the fair and efficient adjudication of this controversy;

2. The case should not be allowed to proceed as a class action because the named plaintiffs cannot fairly or adequately represent the alleged class;

3. None of the named plaintiffs has a cause of action under the Act in his own right and therefore the case should be dismissed, or at least it should not proceed as a class action.

The named plaintiffs in opposition to the defendants' motion contend that all the prerequisites for a class action under Rule 23 of the Federal Rules of Civil Procedure are satisfied.

## I. REQUIREMENTS FOR THE MAINTENANCE OF A CLASS ACTION

In order for a class action to be the proper mechanism for adjudicating a controversy, the following requirements of Rule 23(a) must all be satisfied:

1. The class must be so numerous that joinder of all members would be impracticable;

2. There must be questions of law or fact common to the class;

3. The claims or defenses of the representative parties must be typical of the claims or defenses of the class; and

4. The representative parties must fairly and adequately protect the interests of the class.

In addition, one of the provisions of Rule 23(b) must also be satisfied. The parties have agreed that the purported class of plaintiffs must meet the requirements of Rule 23(b)(3) which provides:

"The Court finds that the questions of law or fact common to the members of

---

tem is one covered under the Act. Defendants however assert that the charge is a late payment or delinquency charge which defendants may properly assess incident to a 30-day cash account system which is not covered by the provisions of the Act. This Court need not pass on the merits of this argument at this time.

8. In defendants' Mid-Continent Area alone, 10.8% of defendants' credit card accounts each month have a 1½% charge, assessed against them as a result of non-paying for purchases within the applicable 60-day period. During the period between July 1, 1969 (the effective date of the Act) and March 1, 1970 (the cut-off date for discovery herein), the defendants billed an average of 512,600 accounts per month in the Mid-Continent Area. An average of 55,555 accounts were assessed a 1½% charge each month during this period, and the average 1½% charge assessed per account per month was only $.55. (See Stipulation of Facts of October 31, 1972).

The minimum statutory penalty of $100 per consumer credit transaction is nearly 200 times greater than the $.55 average 1½% monthly charge assessed against defendants' Mid-Continent Area credit card accounts. For the year 1969 in the Mid-Continent Area, defendants billed approximately $360,000 in 1½% charges and actually collected less than half of the amount of 1½% charges billed. (Stipulation of Facts of October 31, 1972).

the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action."

This Court is of the opinion that the purported class of plaintiffs does not meet the prerequisites of Rule 23.

## II. THE PURPORTED PLAINTIFF CLASS FAILS TO MEET THE REQUIREMENTS OF RULE 23(b) (3)

 Numerous Federal District Courts have considered the appropriateness of class actions in Truth in Lending cases [9]. Courts in deciding the class

---

9. *Class actions held proper:*

Berkman v. Westinghouse Electric Corp., Civil No. 69 C 2056 (N.D.Ill., filed June 25, 1970). 4 CCH Consumer Credit Guide Par. 99,268 (1972).

Douglas v. Beneficial Finance Co. of Anchorage, 334 F.Supp. 1166 (D. Alaska 1971).

Eleando v. McGinnis Used Cars, Civil No. 70–63 TUC (D.Ariz., Filed Apr. 28, 1971).

Eovaldi et al. v. The First National Bank of Chicago, 57 F.R.D. 545 (N.D. Ill., 1972) (McMillen, J.).

Flickinger v. Horeshoe Development Company, Civil No. 11–334–C–1 (S.D. Iowa, filed March 10, 1972).

Joseph v. Norman's Health Club, Inc., 336 F.Supp. 307, (E.D.Mo., 1971) (four consolidated cases).

Katz v. Carte Blanche Corp., 52 F.R.D. 510, 53 F.R.D. 539 (W.D.Pa.1971).

Lamar v. H & B Novelty & Loan Co., 55 F.R.D. 22 (D.Or.1972).

Martin v. Family Publications Service, Inc., Civil No. 5829 (D.Vt., filed June 30, 1970).

Richardson v. Time Premium Co., Civil No. 70–1814–Civ.–JLK (S.D.Fla., filed Feb. 5, 1971).

Smith v. International Magazine Service of Mid Atlantic, Inc., Civil No. 71–16–F (W.D.W.Va., filed Oct. 29, 1971), 4 CCH Consumer Credit Guide par. 99,249 (1972).

Zachary v. Chase Manhattan Bank, 52 F.R.D. 532 (S.D.N.Y.1971).

*Class Actions Held Improper:*

Allerton v. Century Credit Corp., Civil No. 70–1614–Civ.–PF (S.D.Fla., filed Aug. 2, 1971), 4 CCH Consumer Credit Guide, par. 99,271.

Alsup v. Montgomery Ward & Co., Inc., 57 F.R.D. 89 (N.D.Cal., 1972) (two consolidated cases).

Boggs v. Alto Trailer Sales, Inc., Civil No. 71–1271 (E.D.La., filed Aug. 8, 1972).

Castaneda v. Family Publications Service, Inc., Civil No. C–2317 (D.Colo., filed July 2, 1971).

Garza v. Chicago Health Clubs, 56 F.R.D. 548 (N.D.Ill.1972).

Gerlach v. Allstate Insurance Co., 338 F.Supp. 642 (S.D.Fla.1972).

Goldman v. The First National Bank of Chicago, 56 F.R.D. 587 (N.D.Ill. 1972).

Grubb v. Dollar Loan Co., Civil Actions Nos. 15550, 15976 (N.D.Ga., filed May 26, 1972).

Haynes v. Logan Furniture Mart, Inc., No. 70 C 1827 (N.D.Ill., Sept. 20, 1972).

Kenney v. Landis Financial Group, Inc., 349 F.Supp. 939 (N.D.Iowa 1972).

Kriger v. European Health Spa, Inc., of Milwaukee, Wis., 56 F.R.D. 104 (E.D.Wis.1972).

Kroll et al. v. Cities Service Oil Company, 352 F.Supp. 357 (N.D.Ill., 1972).

Moon v. Courtesy Finance Co., Civil No. 15087 (N.D.Ga.).

Mourning v. Family Publications Service, Inc., 4 CCH Consumer Credit Guide, para. 99,632 (S.D.Fla., 1971).

Ratner v. Chemical Bank New York Trust Co., 329 F.Supp. 270 (S.D.N.Y. 1971), 54 F.R.D. 412 (S.D.N.Y.1972).

Rodriguez v. Family Publications Service, Inc., 57 F.R.D. 189 (C.D.Cal., filed Nov. 16, 1972).

action question in recent Truth in Lending cases have emphasized that it is necessary under Rule 23(b)(3) that the class action "[must be] superior to— not just as good as—other available methods for handling the controversy".[10] The question of whether a class action is superior is an area in which the courts can and have used considerable discretion of a pragmatic nature.[11]

There are several reasons why a class action would not be a superior means of adjudicating the instant action.

First, in the instant action there exists a possible class recovery which threatens annihilating punishment to the defendants. As already noted, damages pursuant to the Act for the Mid-Continent Area alone could exceed $200,-000,000 per month for each of the months in question. At the same time the actual damages caused by a "finance" charge assessed to certain card-holders averaged less than $.55 per month.

■■ It is well settled that the class action device is inappropriate in Truth in Lending cases where, as in the instant action, the size of the potential class, coupled with the statutory minimum recovery of $100 would result in absurdly high or ruinous damages, wholly unrelated to the actual harm caused by the violations. Ratner v. Chemical Bank New York Trust Company, *supra*; Goldman et al. v. The First National Bank of Chicago, *supra*; Garza et al. v. Chicago Health Clubs, Inc. et al., *supra*.[12]

■ Second, Courts have held that the incentive of class action benefits are unnecessary in view of the Act's provision for a $100 minimum recovery and payment of costs and reasonable attorney's fees. Ratner v. Chemical Bank New York Trust Co., *supra*; Rogers v.

---

Roesel v. The Fulton National Bank of Atlanta, Civil Action No. 15376 (N.D. Ga., filed May 25, 1972).

Rogers v. Coburn Finance Corp. of De-Kalb, 53 F.R.D. 182 (N.D.Ga., 1971). 54 F.R.D. 417 (N.D.Ga.1972).

Shields v. First National Bank of Arizona, 56 F.R.D. 442 (D.Ariz., 1972).

Smith v. Customers Loan Corp., Civil No. 15253 (N.D.Ga., filed Aug. 10, 1971).

Syna v. Diners Club, Inc., 49 F.R.D. 119 (S.D.Fla.1970).

Wilcox et al. v. Commerce Bank of Kansas City, 55 F.R.D. 134 (D.Kan., 1972).

10. Buford v. American Finance Co., 333 F.Supp. 1243, 1250 (N.D.Ga.1971). See also Ratner v. Chemical Bank New York Trust Co., 54 F.R.D. 412 at 416 and Shields v. First National Bank, 56 F.R.D. 442 (D.Ariz., 1972).

The *Advisory Committee* in notes accompanying the Amended Rule states: "Subdivision (b)(3) encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results". 39 F.R.D. 69, 102–103.

11. Wilcox et al. v. Commerce Bank of Kansas City, No. 72–1494 (10th Cir., Feb. 20, 1973) ; Ratner v. Chemical Bank New York Trust Co., supra; Buford v. American Finance Co., supra; Shields v. First National Bank, supra; Rogers v. Coburn Finance Corp., supra; Shields v. Valley National Bank, 56 F.R.D. 448 (D.Ariz.1971.).

12. Plaintiffs in their Memorandum recognize that the punishment they seek to impose upon defendants would be "undesirable" and offer to reduce the amount of recovery far below the statutory minimum. They propose that the amount of recovery should be limited to double the monthly finance charges or $496,300 plus $100 for each of the three named plaintiffs. This Court in *Goldman* has previously held that such a reduction of the statutorily imposed minimum civil penalty is an improper method for preserving class actions under the Act. See also Kroll et al. v. Cities Service Oil Company, *supra*, where Judge Tone held that a similar offer to reduce was inappropriate, cf. Eovaldi et al. v. The First National Bank of Chicago, *supra*, where no decision as to reduction has yet been reached.

Coburn Finance Corp., *supra*; Shields v. First National Bank, *supra*.[13]

Third, class actions would be an inefficient means of adjudicating the instant action. Any class action would involve a number of delinquent credit card holders. Clearly, defendants have a plethora of small claims against these delinquent credit card holders which might well have to be asserted as compulsory counterclaims under the Federal Rules. Such a result would turn this action into a wholly unmanageable proceeding. Such counterclaims are not ordinarily involved in other types of class actions.[14]

■ Furthermore, the substantial difficulty which would be encountered by the parties in proving various members of the class use their cards primarily for business rather than for personal use has already been demonstrated with regard to the named plaintiff, Adelman. The Act is primarily directed at consumer protection rather than business credit. Defendants contend that they have the "due process" right to require proof as to whether the primary use of the credit card during the months in question was personal or business from each of its credit card holders. The necessity for such proof makes this action entirely unmanageable. A shorter route of proof might well deprive defendants of "due process" rights which under Rule 23(b)(3) is strictly prohibited.

■ Any one of the above reasons is sufficient in and of itself to indicate the failure of the plaintiff class to meet the requirements of Rule 23(b)(3). The combined effect of the above reasons makes it abundantly clear that the plaintiff class fails to meet the necessary requirements of Rule 23(b)(3). Thus a class action is not appropriate because there are questions of law or fact affecting only individual members of the class which predominate over questions common to the members of the class (i. e. whether the credit cards were used mainly for personal or business purposes) and because a class action is not superior to other available methods for the fair and efficient adjudication of the controversy.

## III. IT IS DOUBTFUL THAT THE PLAINTIFF CLASS HAS MET ALL THE REQUIREMENTS OF RULE 23(a)

The failure of the plaintiff class to meet the necessary requirements of Rule 23(b)(3) is fatal to the maintenance of a class action in the instant action. Thus it is not necessary for this Court to decide whether the plaintiffs meet all the requirements of Rule 23(a). This

13. This Court in *Goldman* fully embraced Judge Frankel's eloquent statement of this proposition:

> Students of the Rule [Rule 23(b)(3)] have been led generally to recognize that its broad and open-ended terms call for the exercise of some considerable discretion of a pragmatic nature. Appealing to that kind of judgment, defendant points out that (1) the incentive of class-action benefits is unnecessary in view of the Act's provisions for a $100 minimum recovery and payment of costs and a reasonable fee for counsel; and (2) the proposed recovery of $100 each for some 130,000 class members would be a horrendous, possibly annihilating punishment, unrelated to any damage to the purported class or to any benefit to defendant, for what is at most a technical and debatable violation of the Truth in Lending Act. These points are cogent and persuasive. They are summarized compendiously in the overall conclusion stated earlier: the allowance of this as a class action is essentially inconsistent with the specific remedy supplied by Congress and employed by plaintiff in this case. It is not fairly possible in the circumstances of this case to find the (b)(3) form of class action 'superior to' this specifically 'available [method]' for the fair and efficient adjudication of the controversy.' [Ratner v. Chemical Bank New York Trust Co., *supra*] 54 F.R.D. at 416.

14. See Ratner v. Chemical Bank New York Trust Co., supra note 7.

Court in passing will merely state those factors which cast serious doubt on whether the plaintiff could have met these requirements.

1. Plaintiffs Berkman and Adelman are attorneys. Some courts have denied class actions based on the impropriety of a plaintiff-attorney's representation of a class in Truth in Lending cases. Shields et al. v. First National Bank of Arizona, *supra*; Shields et al. v. The Valley National Bank of Arizona, *supra*; Kriger et al. v. European Health Spa, Inc., et al., *supra*; Buford v. American Finance Co., *supra*; Botney et al. v. American Airlines, Inc., et al., *supra*. This Court in its opinion in *Goldman* did not decide the issue of the impropriety of a plaintiff-attorney purporting to represent the interests of a class, nor will this Court at the present time decide the issue of propriety. Yet, this Court is not blind to the possible dangers present in this situation.[15]

2. It is doubtful whether the named plaintiffs can fairly and adequately represent the interests of the members of the alleged class. The named plaintiffs are not presently credit card holders. Some courts have held that named plaintiffs who are no longer credit card holders cannot proceed with a purported class action on behalf of credit card holders because they lack the first and foremost quality of standing, i. e. they are no longer a member of the class they seek to represent. Syna et al. v. Diners Club, Inc., 49 F.R.D. 119 (S.D.Fla. 1970); Syna et al. v. Shell Oil Company, 241 So.2d 458 (Fla.App., 1970); See also Garland v. Mobil Oil Corp., 340 F. Supp. 1095 (N.D.Ill., 1972).

3. The claims of the named plaintiffs are not typical of the claims of the class. Berkman and Zaban were not assessed a finance charge and thus their position and standing are distinguishable from other members of the purported class who had been assessed a finance charge. There is a question as to whether the plaintiff Adelman used his credit card primarily for personal purposes.

While this Court need not rule on whether the plaintiff class meets all the requirements of Rule 23(a), the cumulative effect of the above cited factors is to cast serious doubt on the appropriateness of a class action in this case under Rule 23(a).

IV. THE DENIAL OF CLASS ACTION TREATMENT IN THE INSTANT ACTION WILL NOT FLOOD THE COURTS, RING THE DEATH KNELL ON PROPER CLASS ACTIONS, AND IS NOT CONTRARY TO LEGISLATIVE INTENT

Thus far, there has been a dearth of objections to defendants' credit card operations. No credit card holders have attempted to intervene in this suit and nothing has come to the attention of this Court to indicate that anyone is relying on the named plaintiffs to pursue this cause. Thus, contrary to plaintiffs' contentions, it is doubtful that denial of the class action will cause the courts to be flooded with thousands of small lawsuits. Further, it is questionable whether class members who have actually relied upon this action and have withheld filing suit could be prevented from filing suit by the Statute of Limitations. See Ratner v. Chemical Bank New York Trust Co., *supra*.

■ Plaintiffs have alleged that if class action treatment is denied here, it will ring the "death knell" to consumer class actions in all fields. Plaintiffs pose the question "Will price fixing and other anti-trust cases be next?" Plaintiffs overlook the fact that in the usual

---

15. For a delineation of these dangers see: Class Action Under the Truth in Lending Act, 87 Notre Dame Lawyer 1305, 1316–17; Handler, The Shift From Substantive to Procedural Innovation in Anti-Trust Suits—the Twenty-Third Annual Anti-Trust Review, 71 Colum.L.Rev. 1, 9 (1971).

anti-trust case actual damage to each member of the plaintiff class is far in excess of the minimal kind of damages involved in the instant action, and that the standard of punitive damages in anti-trust cases is three times actual damages and not as in the instant action at least 200 times the alleged damage required. The strong possibility of ruinous, annihilating punishment in Truth in Lending class actions makes that type of consumer class action distinguishable from other consumer class actions and less desirable. Ratner v. Chemical Bank New York Trust Co., *supra*, 3B Moore's Federal Practice p. 53 (1972 Supp.).

In support of their position regarding the propriety of a class action in this case, plaintiffs point to Senate Bill 652, passed by the Senate in May of 1972, in which the Senate proposed to limit liability in class actions brought under the Truth in Lending Act to $100,000. The plaintiffs contend that this bill is tantamount to express recognition by the Senate that class actions are allowable under the Act even if the amount of the recovery may be large.

The legislative history of the Truth in Lending Act indicates that the legislators never considered the enormous liability which could result from class actions brought under the Act or even the possibility of a class action.[16]

It was not until the Board of Governors of the Federal Reserve System made their 1971 annual report to Congress on Truth in Lending that the problem came to the Congress' attention. In their report the Board of Governors said:

"While the question of class action liability in the *Ratner* case . . . has not yet been decided, the reported $13 million potential liability has led many creditors to believe that similar suits filed against them could seriously threaten the solvency or future existence of their organization.[17]

The Board recommended that:

". . . it also may be desirable to set a maximum liability, should it be finally determined that class actions are allowable in Truth in Lending suits." [18]

The Federal Reserve Board's recommendation was considered by the Senate Committee on Banking, Housing and Urban Affairs, which in its report to the Senate said:

". . . As the Federal Reserve Board's 1971 Annual Report on the Truth in Lending Act pointed out, these (minimum damage) provisions of section 130 raise serious problems because of their possible applicability in class actions. The $100 minimum liability provision could produce an enormous penalty upon a creditor if

16. See Class Actions Under the Truth in Lending Act, 87 Notre Dame Lawyer 1305, 1307 n. 25 (June 1972); Dole, Private Enforcement of Consumer Credit Legislation, The Business Lawyer 915, 917 (January, 1971). In fact, Senator Frank E. Moss (D.Utah), Chairman of the Consumer Subcommittee of the Senate Commerce Committee and actively involved in Truth in Lending Legislation stated at a hearing on the Consumer Protection Act of 1969 to then Assistant Attorney General Richard McLaren, "I do not believe class actions are permissible under Truth in Lending". Mr. McLaren responded by stating that the civil right of action provided for by the Act was subject to the Federal Rules of Civil Pro-

cedure and therefore amenable to class action. This suggests that Legislators who enacted the Truth in Lending legislation were under the belief that a class action in cases brought under the Act were not possible. Hearings Before the Consumer Subcommittee of the Senate Committee on Commerce on S. 2246, S. 3092 and S. 3201, 91st Cong., 1st and 2nd Sess., ser. 91–43 pt. 1, at 27 (1970).

17. 1971 Annual Report of Board of Governors of Federal Reserve System to Congress on Truth in Lending, p. 18.

18. Id. cf. 1972 Annual Report of Board of Governors of Federal Reserve System to Congress on Truth in Lending, p. 13–15.

applied to all the members of a class action suit filed in a Federal Court pursuant to Rule 23 of the Federal Rules of Civil Procedure. This may be especially true in the case of a credit card plan where the alleged violation affects millions of card holders.[19]

Senate Bill 652 was sent to the House Banking and Currency Committee where it remained for approximately six months. With the conclusion of the 1972 Congressional Term, S. 652 "died" in Committee and it may or may not be resubmitted to Congress for consideration. While S. 652 was pending before the House, Rep. Florence Dwyer, the ranking minority member of the Consumer Affairs Subcommittee of the House Committee on Banking and Currency said that "there are significant problems remaining to be ironed out. These include the question of class action liability under Truth in Lending, which clearly needs limitation . . ."[20]

■ Thus in view of this legislative history, it is difficult to conclude that Congress recognized anything other than that excessive class action judgments were not intended by the original Truth in Lending Act. Thus S. 652, contrary to the contention of the plaintiffs, demonstrates, if anything, the Congressional recognition that class actions in Truth in Lending cases should not be allowed

where their result in damages would be as ruinous and annihilating as in the instant action.

Accordingly, it is hereby ordered that the defendants' motion that this cause not proceed as a class action is granted.

---

19. Report on Senate Committee on Banking, Housing and Urban Affairs on S. 652, dated April 17, 1972, 92 CCH Consumer Credit Guide (Special Report) part 1, p. 12 (April 25, 1972).

The Committee thus recommended that a limit of $50,000 plus actual damages be placed on a creditor's class action liability. In addition, it recommended that there should be no higher limit on class action damages and that, in determining what part of the $50,000 should be awarded, courts should consider "the amount of actual damages awarded, the frequency and persistence of failures of compliance by the creditor, the resources of the creditor, the number of persons adversely affected, and the extent to which the cred-

itor's failure of compliance was intentional (id. at 51). The Committee further stated that the limitation on class action liability would apply retroactively to pending lawsuits because it felt that "some clarification is needed to avoid excessive judgments not intended by the original Truth in Lending Act". (id. at 13) Although the final Senate Bill changed the $50,000 maximum limit to $100,000, it changed neither the provision making the Bill retroactive nor the provision setting forth the factors to be considered in determining the extent of the creditor's liability.

20. 99 CCH Consumer Credit Reports p. 6.