**Alan J. WHITE, Plaintiff,**

**v.**

**ARLEN REALTY & DEVELOPMENT CORP., Defendant (two cases).**

**Civ. Nos. 72-789-H, 72-998-H.**

United States District Court,
D. Maryland.

April 18, 1974.

Alan J. White, pro se.

Joel M. Wolosky, New York City, and Randall M. Lutz, Baltimore, Md., for defendant.

ALEXANDER HARVEY, II, District Judge.

Plaintiff, an attorney employed by the Federal Power Commission in Washington, D. C., has instituted these civil actions *pro se* "for the express purpose of testing"[1] certain provisions of the Truth in Lending Act, 15 U.S.C. § 1601 et seq. Defendant is a publicly held corporation which owns and operates discount department stores which do business in Maryland and other states under the name of "Korvettes".

At the time of the matters in suit, plaintiff and his wife were customers of the Korvettes store located in Rockville, Maryland, and plaintiff had been the owner of a Korvettes credit card for some years. Plaintiff and his wife used such credit card to make purchases of merchandise at Korvettes between June 1, 1971 and February 1, 1972. Plaintiff alleges that defendant extended credit to him and his wife on twelve separate oc-

casions during that period and that defendant's billing statements did not comply with provisions of the Truth in Lending Act and Regulation Z, issued thereunder by the Board of Governors of the Federal Reserve System.[2]

Suit was first instituted by plaintiff in the United States District Court for the District of Columbia. Thereafter, another action was filed in the United States District Court for the Eastern District of Virginia. Both of these cases were transferred to this Court under 28 U.S.C. § 1404(a). By agreement, both cases were consolidated for all purposes and leave was granted to plaintiff to file a consolidated amended complaint.

The amended complaint consists of 13 Counts. The first twelve Counts each relate to a separate purchase made by plaintiff or his wife at Korvettes between June 1, 1971 and February 1, 1972. Plaintiff contends that defendant violated the Truth in Lending Act in billing for each of these twelve purchases and seeks, pursuant to 15 U.S.C. § 1640, to recover the statutory amount of $100 under each Count, or a total of $1200, together with costs and a reasonable attorney's fee. In Count 13, plaintiff alleges other violations occurring more than one year prior to the filing of the amended complaint and seeks an injunction which would require defendant to notify Korvettes cardholders of possible causes of action they might have under the Act. Defendant has denied any violations of the Act as alleged in Counts 1 through 12, and claims that under the facts here the plaintiff is not an aggrieved debtor entitled to sue. Defendant has further filed a motion to dismiss Count 13, claiming that the allegations of such Count are legally insufficient to permit plaintiff to be entitled to the relief there sought.[3]

1. Plaintiff's Trial Memorandum, page 1.

2. The Federal Reserve Board was empowered by 15 U.S.C. § 1604 to prescribe regulations to carry out the purposes of the Act. The text of Regulation Z may be found in 12 C.F.R. § 226.1–226.12.

3. It has been agreed that the motion to dismiss would be heard at the time of the trial and that if the motion were denied, a later and separate trial would be held solely as to Count 13.

### The Act

The Truth in Lending Act was passed by Congress in 1968, following several years of study and debate as to the propriety and usefulness of imposing mandatory disclosure requirements on those who extend credit to consumers in the American market. Mourning v. Family Publication Service, Inc., 411 U.S. 356, 363, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973). Congressional hearings revealed that consumer credit had expanded at a rapid rate since World War II but that consumers remained remarkably ignorant of the nature of their credit obligation and of the cost of deferring payment. *Idem,* 411 U.S. at 363, 93 S. Ct. 1652. Because of the divergent and at times fraudulent practices by which consumers were informed of the terms of the credit extended to them, many consumers were prevented from shopping for the best terms available and at times were prompted to assume liabilities they could not meet. *Idem,* 411 U.S. at 363, 93 S.Ct. 1652. Designed to remedy the problems which had developed, the Act explicitly stated its purpose as follows (15 U.S.C. § 1601):

> "The Congress finds that economic stabilization would be enhanced and the competition among the various financial institutions and other firms engaged in the extension of consumer credit would be strengthened by the informed use of credit. The informed use of credit results from an awareness of the cost thereof by consumers. It is the purpose of this subchapter to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit."

The Act undertakes to regulate a broad range of kinds of credit extended by lending institutions, stores, credit card issuers and other business and professional entities. The present case concerns the alleged extension of credit by a department store following a purchase of goods by a customer. During the relevant periods here involved, defendant employed an open end credit plan at its Korvettes stores and had issued credit cards to various customers, including the plaintiff. An open end credit plan is defined in the Act as one prescribing the terms of credit transactions which may be made thereunder from time to time and under the terms of which a finance charge may be computed on the outstanding unpaid balance from time to time thereunder. 15 U.S.C. § 1602(i). Plaintiff applied for and was issued two Korvettes credit cards in December 1964, and he and his wife held and used such cards until he returned them on February 17, 1972, with a letter of complaint.

§ 1637 of the statute deals with required disclosures which must be made by a creditor of any account under an open end consumer credit plan such as the one involved here. No question is raised in this case concerning disclosures which a creditor must make under § 1637(a) or § 1637(c). Plaintiff's claim is that defendant failed to comply with certain provisions of § 1637(b) when defendant billed plaintiff for the twelve purchases here involved. Pertinent provisions of Subsection (b) are as follows:

> "(b) The creditor of any account under an open end consumer credit plan shall transmit to the obligor, for each billing cycle at the end of which there is an outstanding balance in that account or with respect to which a finance charge is imposed, a statement setting forth each of the following items to the extent applicable:"

  \*   \*   \*   \*   \*   \*

Ten separate items are then listed in Subsections (b)(1) through (b)(10) which detail information deemed necessary by Congress to inform a consumer of the amount and type of credit being extended. Subsection (b)(2) is the critical provision in this case and requires the statement in question to set forth:

> "(2) The amount and date of each extension of credit during the period, and, if a purchase was involved, a

brief identification (unless previously furnished) of the goods or services purchased."

Plaintiff is not here claiming that defendant did not inform him of the amount and date of any extension of credit during the period covered by the billings. The billing statements used by Korvettes were designed to and did in fact furnish such information to its customers. Furthermore, plaintiff was not one of those customers who sought any such extension of credit, and thus plaintiff was never assessed any interest or finance charges on amounts billed. It was plaintiff's custom to pay for purchases within the 25-day grace period allowed before finance charges were imposed under defendant's plan. The only claim pressed by plaintiff in this case under § 1637(b)(2) is that defendant did not supply him with proper identification of the goods he or his wife purchased and that therefore he is entitled to recover the statutory amount of $100 for each purchase involved.

*Plaintiff's Standing to Sue as an Aggrieved Debtor*

The first question before the Court is whether the facts here indicate that the plaintiff is a proper person under the Act to charge defendant with these alleged violations. Defendant contends that no monetary damage or other injury of any kind was sustained by plaintiff at any time as a result of the transactions here involved since plaintiff never sought nor was he extended any credit by defendant.

The evidence in this case discloses that plaintiff is a practicing attorney, who has worked as such for various Government agencies including the Securities & Exchange Commission, the Federal Home Loan Bank Board and more recently, the Federal Power Commission. Plaintiff and his wife had patronized defendant's Korvettes store in Rockville, Maryland for many years before the dates here involved, having been issued credit cards in December 1964. The store in question is a discount operation which uses a central checkout system as a means of reducing operating costs. Between June 1, 1971 and February 1, 1972, plaintiff or his wife made the following purchases of merchandise at Korvettes:

| Count of Complaint | Date | Total Amount of Purchase | Number of Items Purchased |
|---|---|---|---|
| Count 1 | June 1, 1971 | $ 6.23 | 1 |
| Count 2 | June 8, 1971 | 14.55 | 1 |
| Count 3 | June 10, 1971 | 10.33 | 3 |
| Count 4 | Aug. 7, 1971 | 5.56 | 6 |
| Count 5 | Aug. 24, 1971 | 5.69 | 1 |
| Count 6 | Sept. 18, 1971 | 4.16 | 2 |
| Count 7 | Sept. 18, 1971 | 10.58 | 3 |
| Count 8 | Dec. 2, 1971 | 2.39 | 1 |
| Count 9 | Dec. 2, 1971 | 4.15 | 1 |
| Count 10 | Dec. 16, 1971 | 30.74 | 8 |
| Count 11 | Jan. 29, 1972 | 11.67 | 6 |
| Count 12 | Feb. 1, 1972 | 16.76 | 3 |

As to each of these purchases, either plaintiff or his wife would select the item desired and take it to a checkout counter. Plaintiff's credit card would then be presented and placed in the imprinter there located. With the merchandise purchased, plaintiff or his wife would receive two documents, a cash

register tape and a copy of the charge slip. The cash register tape showed the number of items purchased, the tax and the total purchase price. The charge slip showed the name and account number of plaintiff's charge card, the date and the total amount of the sale. In addition, each of the charge slips in evidence in this case (except for the charge slip dated June 1, 1971) contained either the legend "Hard Goods" or the legend "Apparel".

It was plaintiff's practice to retain these documents, together with other financial records. Upon receipt of defendant's statement, plaintiff would verify the accuracy of the bill from the records in his possession and would then pay by check the full amount shown on the bill. Defendant's billing statements indicated that to avoid a finance charge payment was required to be made within 25 days of the billing date. In each of the instances herein involved except for the transactions in Counts 1, 2, 11 and 12, plaintiff paid the bill in full within the 25-day period. At no time did plaintiff incur or pay any finance or other charges resulting from his deferral of the payment of his account with defendant.

Counts 1 and 2 relate to purchases made by plaintiff or his wife on June 1 and June 8, 1971. This merchandise was returned on June 10 and June 15, and defendant's bill of June 30, 1971 gave plaintiff full credit for such returns. Thus, plaintiff was ultimately not billed for nor did he pay for these items as the sales transactions in question were rescinded.

Counts 11 and 12 relate to purchases made by plaintiff on January 29 and February 1, 1972. Plaintiff has never paid the amounts billed for these purchases. On February 17, 1972, plaintiff wrote a letter to the Chairman of the Board of Directors of defendant to the following effect: [4]

"I'm enclosing my Korvettes charge cards to close my account as I do not wish to continue as its customer.

"On January 22nd I brought 11 color slides to Korvettes' Rockville, Maryland, store and ordered prints in various sizes and quantities. I reported back a week later on January 29th, as instructed, but my order was incomplete. I reported back again on February 1st to obtain the balance of my order and, after checking it at home, I returned to reorder one 8x10 print which was unacceptable and two 5x7 prints which were missing. I returned to the store on February 7th and again on February 9th; on the latter date I received a credit for the reordered 8x10 print which still was unacceptable. I returned again on February 12th; and since I could not obtain any information on my order I left written instructions that my slide was to be returned on February 14th (with or without the prints) or I wouldn't pay my bill (which totaled $28.43).

"I returned for the sixth time on February 14th and learned that nothing had been done to obtain my slide. I asked for the store manager and was introduced, first, to Mr. Paul Moreno, Merchandise Manager, and second, to Mr. Sid Mittelman, Store Manager or Assistant Store Manager. When I told Mr. Mittelman that I would not pay my bill he laughed and said that he didn't care because, as far as he was concerned, Korvettes already received its money from the credit company. When I pointed out that I used a Korvettes charge rather than a BankAmericard charge, and asked that he repeat his statement, he quickly changed his story and said that he would do everything to help me and that Korvettes' credit organization is a separate company with which he has nothing to do. And when I took him

---

4. Plaintiff wrote and mailed this letter on February 17, 1972. When it was returned because of a wrong address, he wrote another letter to the Chairman of the Board dated March 4, 1972, enclosing the first.

up on his offer to help me, he refused to send someone to the processor to look for my slide. Messrs. Moreno and Mittelman were polite and commenced an inquiry into my order, which no one else had offered to do.

"When I first brought my mixture of Kodak and non-Kodak slides to Korvettes' Rockville store it was represented to me that Kodak will not make prints from non-Kodak slides, so I authorized the prints to me [*sic*] made by someone else. The name Perfect Photo comes to mind. Frankly, I was terribly disappointed by the dullness of the prints. So for comparison, I had one identical print made elsewhere *by Kodak* from each of two *non-Kodak slides,* and the Kodak prints were infinitely brighter and livlier.

"As a result, I choose not to continue to do business with Korvettes. My current billing statement in the amount of $26.19 is due for payment on February 25th and, as I threatened, I will not pay it on that date. Furthermore, I will not pay any finance charges resulting from such action. Whether and how much I eventually pay will depend largely on how the situation is handled." (Emphasis in original)

■ Whether a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy is what has traditionally been referred to as the question of standing to sue. Sierra Club v. Morton, 405 U.S. 727, 731–732, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). In that case, the Supreme Court indicated that where Congress has authorized public officials to perform certain functions according to law and has provided by statute for judicial review of those actions, the inquiry as to standing must begin with a determination of whether the statute in question authorizes review at the behest

of the plaintiff. The same principle would appear to be applicable where Congress has given a private citizen the right to bring suit in a federal court to enforce a Congressional policy such as that set forth in the Truth in Lending Act. § 1640 specifically confers such right to sue on any person to whom a creditor has failed to disclose the information required by the Act.

■ However, it is the fact of economic injury, whether actual or threatened, which gives a person standing to seek judicial review under a statute such as the one here involved. Sierra Club v. Morton, *supra,* 405 U.S. at 737, 92 S.Ct. 1361. There can be little doubt that the Truth in Lending Act is a remedial statute which should be broadly construed in the light of its purposes. But it goes too far to say that an individual who appoints himself a private attorney general to enforce the provisions of a Congressional enactment need have no personal stake in the matter. As the Supreme Court noted, 405 U.S. at page 737, 92 S. Ct. 1361 of the *Sierra Club* opinion, an individual must first have personal standing before he can represent the public interest as a private attorney general.[5] It is the responsibility of a federal court to resolve only concrete disputes which have been brought before it for decision. See Younger v. Harris, 401 U.S. 37, 52, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

■ Furthermore, the legislative history of the Truth in Lending Act indicates that only "an aggrieved debtor" would be entitled to institute suit. Bostwick v. Cohen, 319 F.Supp. 875, 878 (N.D.Ohio 1970). In discussing civil and criminal penalties prescribed by the Act, the House Report said the following (House Report No. 1040, 90th Cong., 2d Session, 1968 U.S.Code Cong. and Admin.News at p. 1976):

"While primary enforcement of the bill would be accomplished under the

---

5. In any event, plaintiff's motive in proceeding in this case as a private attorney general is suspect in view of the fact that he took no action until a dispute arose with the de-

fendant concerning the quality of merchandise purchased on January 29 and February 1, 1972.

administrative enforcement section discussed above, further provision is made for the institution of civil action by an *aggrieved debtor*." (Emphasis supplied)

■ The plaintiff concedes that a cash customer of Korvettes would have no right to bring suit under the Act but claims that any purchaser using a credit card would be entitled to sue whether or not any finance or other charge was ultimately incurred. But certainly transactions which are rescinded, such as those involved in Counts 1 and 2, would not permit a customer to sue to enforce provisions of the Act. As the merchandise in question was returned and as plaintiff was given full credit for such return, he did not incur any liability at all to defendant and cannot be said to have suffered any economic or other injury as the result of defendant's billing practices. Bostwick v. Cohen, *supra,* 319 F.Supp. at 878, held that rescinding consumers are not within the class of persons which the civil liability provisions of the Act seek to protect.

■ The same would be true insofar as Counts 11 and 12 are concerned. The plaintiff has not paid for the merchandise purchased on January 29 and February 1, 1972, and states that if he is sued he will defend such suit on the grounds that he received poor merchandise.

■ Counts 3 through 10 present a somewhat closer question. It was plaintiff's regular practice to pay his bill within the 25 days allowed before a finance charge would be incurred. He thus never sought any extension of credit from defendant which would have resulted in any obligation on his part to pay finance or interest charges for debt incurred. Furthermore, plaintiff has neither alleged nor proved that he ever failed to identify the goods for which he was billed. Thus, he has not alleged nor proved his need for pertinent information from defendant to permit him to compare the cost of credit terms offered by defendant with those offered by other discount stores or lending institutions so that he might shop effectively for the best credit buy. Until the dispute arose concerning the merchandise purchased in January and February of 1972, plaintiff and his wife were quite satisfied with a course of dealing maintained for many months whereby they would charge their purchases at Korvettes with plaintiff's credit card and pay their bill promptly within the 25-day period. So long as plaintiff "had copies of signed charge slips and he was able to reconcile the amounts of current slips with the 'new balance' shown on the billing statement, he would make payment in full." [6]

■ Under these circumstances, this Court concludes that plaintiff is not an "aggrieved debtor" with standing to enforce the provisions of the Act. The plaintiff here faced no actual or threatened injury as a result of defendant's billing practices. A mere interest in a problem, no matter how longstanding it may be, is not sufficient by itself to render an individual an "aggrieved" person entitled to sue under a statute such as the one here involved. See Sierra Club v. Morton, *supra,* 405 U.S. at 739, 92 S. Ct. 1361.

Plaintiff's reliance on Ratner v. Chemical Bank New York Trust Company, 329 F.Supp. 270 (S.D.N.Y.1971), is misplaced. Although there is broad language in that opinion indicating that any individual such as the plaintiff here would be entitled to sue in the public interest, the language in question was not necessary to the Court's decision. In *Ratner,* the plaintiff was quite clearly an aggrieved debtor. In paying his account, the plaintiff in *Ratner* sent the bank the minimum payment of $10.00 and on its next statement was billed for a finance charge. 329 F.Supp. at 274. Furthermore, the suit in *Ratner* was based on a single transaction. In this case, plaintiff's suit is based on a series

6. Plaintiff's Trial Memorandum, p. 18.

of transactions which occurred over a period of one year and which show a regular course of dealing which did not involve the extension of credit by defendant.

*Identification of the Goods Purchased* [7]

In claiming that defendant's practices violate § 1637(b)(2), plaintiff first argues that identification of the goods purchased must be made on the billing statement itself or on another document which accompanies the billing statement. It is not disputed in this case that no such identification of the goods purchased was made by defendent either on the billing statement furnished to plaintiff or on any other accompanying document.

Defendant here relies on the fact that certain identifying words were at the time of each purchase placed on a charge slip and that a copy of such slip was delivered to plaintiff or his wife on the day the purchase was made. Defendant notes that the statute requires a brief identification of the goods or services purchased "(unless previously furnished)".

Consideration of the history and purpose of the Act leads to the conclusion that defendant did not violate § 1637(b)(2) by furnishing identifying language at the time of purchase rather than at the time of billing. The Act was designed to foster the informed use of credit through disclosures which would enable a consumer to compare more readily various credit terms available to him. 15 U.S.C. § 1601. If a consumer has in his possession when a bill is received a document which was previously furnished and which contained proper language identifying the goods purchased, he can readily decide whether or not to seek credit elsewhere for the purpose of paying the bill. Plaintiff meticulously retained all his records and concededly had a previously furnished charge slip before him in each instance when he made the decision to pay the bill within the 25-day grace period.

Plaintiff argues that the parenthetical phrase "(unless previously furnished)" means "unless previously furnished with a billing statement." But there is no such limitation in the language adopted by Congress, and the plain meaning of the statute considered in the light of the purposes of the Act does not support plaintiff's contention. Interpretations of the statute by representatives of The Federal Reserve Board support this Court's construction of the statutory language here involved. In two separate opinion letters, FRB representatives reached the conclusion that if a retailer gives a customer at the time of the transaction a sales slip identifying goods purchased, there is no need to furnish another sales slip with the billing statement since the information was "previously furnished". FRB letter of April 30, 1969, CCH Consumer Credit Guide ¶ 30,029; FRB letter of June 4, 1969, CCH Consumer Credit Guide ¶ 30,038.

Plaintiff next contends that the identifying language supplied by defendant on each occasion here was insufficient as a matter of law or was insufficient under the facts of this case. The twelve transactions involved here included purchases by plaintiff or his wife of clothing, slide projector trays, photographic prints, light bulbs, phonograph records and toys. The clothing was identified on the charge slips as "Apparel" and the other purchases were identified as "Hard Goods".

Like other self-service discount stores, the Korvettes store in Rockville, Maryland uses a central checkout system. There are many different departments in the store, and goods purchased in most departments may be checked out at a central cash register. When a customer uses his credit card to charge his pur-

---

7. In view of the full briefing and argument by the parties as to the merits, this Court will also undertake to decide the substantive questions presented. It will thus be assumed for the purposes of this portion of the Opinion that plaintiff has standing to sue under the Truth in Lending Act.

chase, an imprinter is used to record pertinent information on the charge slip, including identifying language considered appropriate by the checkout employee. Plaintiff asserts that to comply with § 1637(b)(2), defendant should revise its system to (1) mark price tickets with a department number, (2) redesign sales slips to provide space for listing the department numbers of merchandise purchased, (3) enclose copies of sales slips with billing statements and (4) list department numbers on billing statements together with the names and principal merchandise of the departments.

§ 1637(b)(2) requires no more than a "brief identification" of the goods purchased. Not only did Congress not use the term "description" rather than "identification", but it also included the qualifying adjective "brief". To "identify" means to "establish the identity of" or "show the sameness of". Webster's *Third New International Dictionary*. What was clearly intended by Congress was that some abbreviated term be used which, with other information supplied, would enable the purchaser to connect the bill received with the actual purchase.

This Court concludes that the terminology used by defendant here was not insufficient either as a matter of law or under the particular facts of this case.[8] The terms imprinted on the charge slips were sufficient under the Act to permit plaintiff to decide whether to pay his bill at once or defer payment under the credit terms extended. Moreover, the evidence in this case discloses that plaintiff in fact knew what these purchases were at the time he paid the bills in question.[9] In each instance he was able to connect the bill with the purchase and in each instance he decided to pay promptly the amount billed, except for the amounts billed for his January 29 and February 1, 1972 purchases, which are disputed on grounds other than their identification.[10]

Plaintiff made no complaint to nor claim against defendant concerning the inadequacy of the identifying language in question until after a dispute arose as to the handling of his orders in late January and early February 1972 and the quality of the merchandise then purchased. At the time he or his wife made all the purchases involved in this case, plaintiff was well aware of the provisions of the Truth in Lending Act, as he was then personally involved in litigation in the District of Columbia in which he sought to recover civil penalties for alleged violations under § 1637(b) of the Act. White v. Central Charge Service, Inc., 285 A.2d 305 (D.C.App.1971). His dissatisfaction with the identifying language used at Korvettes Rockville store apparently had little to do with the filing of these suits. Plaintiff quite candidly states that this litigation was "triggered" when he read the May 1972 issue of *Consumer Reports*

8. A similar conclusion was reached in a case brought by plaintiff in the Small Claims and Conciliation Branch of the Superior Court of the District of Columbia. In that case, plaintiff's challenge to the identifying language "general merchandise" was rejected in an opinion written by Judge William S. Thompson. White v. Central Charge Service, Inc., CCH Consumer Credit Guide ¶ 99,170 (D.C.Sup.Ct.1972). An application for the allowance of an appeal was denied by the District of Columbia Court of Appeals. White v. Central Charge Service, Inc., 285 A.2d 305 (D.C.App.1972). The District of Columbia Court of Appeals had previously ruled against plaintiff in a separate case raising other questions under §

1637(b). White v. Central Charge Service, Inc., 285 A.2d 305 (D.C.App.1971).

9. Plaintiff was even able to identify all but two of his purchases many months later when his deposition was taken on December 9, 1972. Although he could not then recall the merchandise purchased on June 10 and August 24, 1971, this Court finds from the evidence in this case that plaintiff or his wife knew what was purchased on the dates when payment was made of the bills submitted less than a month later.

10. Plaintiff asserts that if the defendant wants payment of these amounts, the Chairman of its Board of Directors must respond personally or defendant must sue the plaintiff. Plaintiff's Trial Memorandum, page 18.

in which a reader complained of undescriptive billings and of his inability to satisfy himself as to the accuracy of his bill.[11]

### The Motion to Dismiss Count 13

Count 13 of the amended complaint incorporates pertinent allegations of the other twelve Counts relating to the purchases made by plaintiff and his wife between June 1, 1971 and February 1, 1972. It is further alleged in Count 13 that on numerous other dates more than one year prior to the filing of the complaint, plaintiff and his wife made purchases and received billing statements which did not comply with the Act. Plaintiff alleges that Korvettes is unable to comply with the disclosure requirements of the Act under its present practices, that Korvettes is engaged in a continuing course of conduct which amounts to a wilfull and knowing failure to comply with the Act and that other card holders of Korvettes have causes of action under the Act for the recovery of the $100 statutory penalty because of the failure of defendant to identify goods or services purchased. Plaintiff's prayer for relief under Count 13 is as follows:

> "And plaintiff prays with respect to Count XIII that this Court, pursuant to its equitable powers, (1) require defendant to promptly notify each of its Korvettes card holders, and those who were its Korvettes card holders within the past year, of their possible causes of action under the Truth in Lending Act and of the advisability of promptly consulting legal counsel to protect any rights which they may have; (2) supervise defendant's prepration and transmission of such notice; and (3) protect defendant from class actions by those to whom such notice is transmitted."

In his trial memorandum, plaintiff expressly states that he is not asserting a class action claim in Count 13, because he "chose not to become entangled in the class action web." [12] Nor is plaintiff seeking relief on behalf of himself or his wife. Rather, he seeks to devise "a middle course" in which the defendant would be required to give notification of the possible existence of causes of action similar to plaintiff's "with a view toward private enforcement by anyone who so chooses." [13]

Quite clearly, plaintiff has no standing to seek in this action relief of the sort asked for in Count 13. A litigant may not assert in an individual action the rights of absent third parties. McCabe v. Atchison T. and S. F. R. Co., 235 U.S. 151, 162, 35 S.Ct. 69, 59 L.Ed. 169 (1914).

In Weiner v. Bank of King of Prussia, 358 F.Supp. 684, 690, 692 (E.D.Pa. 1973), this principle was applied by the Court in concluding that only a person to whom the duty of disclosure is owed can recover for a breach of that duty under the Truth in Lending Act. In Burgess v. Charlottesville Savings & Loan Association, 477 F.2d 40, 45 (4th Cir. 1973), the Fourth Circuit observed that a proper construction of the Truth in Lending Act indicates that any private action for violation thereof is limited to the statutory remedy provided and that such an action can provide no basis for other relief.

From a review of the allegations of Count 13 in the light of the Act, this Court concludes that they are insufficient as a matter of law to entitle plaintiff to the relief sought. Defendant's motion to dismiss Count 13 is therefore granted.

### Conclusions

For the reasons stated, judgment is hereby entered in favor of the defendant as to Counts 1 through 12 inclusive. Defendant's motion to dismiss Count 13 is hereby granted. Costs will be assessed against plaintiff.

11. Plaintiff's Trial Memorandum, page 8.

12. Plaintiff's Trial Memorandum, page 25.

13. Plaintiff's Trial Memorandum, pages 25–26.