Alan J. WHITE, Appellant,

v.

ARLEN REALTY & DEVELOPMENT
CORPORATION, Appellee.

No. 74–1890.

United States Court of Appeals,
Fourth Circuit.

Argued May 5, 1975.

Decided Dec. 11, 1975.

As Modified on Rehearing Feb. 17, 1976.

Steven A. Skalet, Washington D. C. (Benny L. Kass, Boasberg, Hewes, Klores, & Kass, Washington, D. C., on brief), for appellant.

Joel M. Wolosky, New York City (Alvin M. Stein, Parker, Chapin & Flattau, New York City, Franklin Goldstein, Baltimore, Md., Burke, Gerber & Wilen, Baltimore, Md., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, BOREMAN,* Senior Circuit Judge, and CRAVEN, Circuit Judge.

CRAVEN, Circuit Judge:

Appellant Alan White brought this suit under the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*, against Arlen Realty and Development Corporation, owner and operator of Korvettes department stores. In his complaint, White alleged that Korvettes violated 15 U.S.C. § 1637 by failing to provide "a brief identification . . . of the goods or services purchased" as required by the Act in connection with a series of 12 purchases made by him and his wife in 1971 and 1972. He sought the statutory minimum penalty of $100 for each violation plus costs and attorney's fees as provided in the Act. 15 U.S.C. § 1640. The district court denied relief, holding that White lacked standing to sue and that the identification provided by Korvettes was sufficient to satisfy the requirements of the Act.[1] We disagree, and reverse.

---

* Judge Boreman dissents.

1. The case is reported as *White v. Arlen Realty & Development Corp.*, 374 F.Supp. 151 (D.Md. 1974).

## I.

White or his wife on 12 occasions between June 1, 1971, and February 1, 1972,[2] made purchases at Korvettes department store located at Rockville, Maryland, using White's Korvettes credit card. On each of these occasions, White or his wife was provided with a charge slip and a cash register tape associated with the purchase. Each charge slip indicated the date and amount of the sale and, with the exception of the June 1 slip which showed no identifying designation at all, identified the goods purchased as either "Apparel" or "Hard Goods." The cash register tape gave the date, the total amount of the purchase, and the price of each item.

White kept these charge slips and cash register tapes. Upon receiving the monthly billing statement from Korvettes, which contained no identification of the purchased goods but only the date and amount of purchase,[3] White compared the amount shown with the corresponding charge slips and cash register tapes. The district court found that using this procedure White was able to verify the accuracy of each billing

statement involved in this case. 374 F.Supp. at 158, 160.

The Korvettes department store at Rockville, Maryland, is composed of 64 separate departments, each offering a "plethora of items of merchandise."[4] Items brought in 25 of these departments were checked out through that particular department's register. Goods selected from any of the other 39 departments could be purchased through a "central checkout." Some of these departments identified goods with one of only two designations, "Apparel" or "Hard Goods;" others, such as the optical, watch repair, and shoe departments, provided more specific designations. For purchases made through central checkout, items were identified either as "Apparel" or "Hard Goods" or more specifically[5] depending *not* on the nature of the goods bought at these locations but on which of these two identifications happened to be permanently affixed to the imprinters used for charge card transactions at the checkout center selected by the customer. In short, the designation meant nothing except that the customer had fortuitously picked a particular checkout register.[6]

**2.** The district court found that the following purchases were made:

| Count of Complaint | Date | Total Amount of Purchase | Number of Items Purchased |
|---|---|---|---|
| Count 1 | June 1, 1971 | $ 6.23 | 1 |
| Count 2 | June 8, 1971 | 14.55 | 1 |
| Count 3 | June 10, 1971 | 10.33 | 3 |
| Count 4 | Aug. 7, 1971 | 5.56 | 6 |
| Count 5 | Aug. 24, 1971 | 5.69 | 1 |
| Count 6 | Sept. 18, 1971 | 4.16 | 2 |
| Count 7 | Sept. 18, 1971 | 10.58 | 3 |
| Count 8 | Dec. 2, 1971 | 2.39 | 1 |
| Count 9 | Dec. 2, 1971 | 4.15 | 1 |
| Count 10 | Dec. 16, 1971 | 30.74 | 8 |
| Count 11 | Jan. 29, 1972 | 11.67 | 6 |
| Count 12 | Feb. 1, 1975 | 16.76 | 3 |

374 F.Supp. at 155.

**3.** The following language appeared on the back of the monthly billing statements received by White:

Identification of each purchase debited to the account and identification of each transaction, other than a payment credited to the account *has been previously furnished* to you in the form of a slip from our cashier or a separate notice from our accounting department.

App. 33, 36 (emphasis added).

**4.** Brief for Appellee at 8.

**5.** White's purchases bore only the identifications "Hard Goods" and "Apparel."

**6.** For example, items from the Boys' and Girls' Clothing Department could be checked out through the Candy Department and would receive the identification "Hard Goods." App. 60–61, 117, 125.

White claims that Korvettes' practices in this case violated the disclosure requirements of the Truth in Lending Act as applied to "open end consumer credit plans" by failing to give as part of each billing statement "a brief identification (unless previously furnished) of the goods or services purchased." 15 U.S.C. § 1637(b)(2).[7] He seeks the statutory minimum penalty for each of the 12 violations plus costs and attorney's fees under 15 U.S.C. § 1640(a).[8]

## II.

■■■ The court held that White was not an "aggrieved debtor"[9] and thus lacked standing to maintain this action since he "faced no actual or threatened injury as a result of defendant's billing practices." 374 F.Supp. at 158.

It was plaintiff's regular practice to pay his bill within the 25 days allowed before a finance charge would be incurred. He thus never sought any extension of credit from defendant which would have resulted in any obligation on his part to pay finance or interest charges for debt incurred. Furthermore, plaintiff has neither alleged nor proved that he ever failed to identify the goods for which he was billed. Thus, he has not alleged nor proved his need for pertinent information from defendant to permit him to compare the cost of credit terms offered by defendant with those offered by other discount stores or lending institutions so that he might shop effectively for the best credit buy. *Id.*

We believe the district court's ruling in this case and its reliance on *Bostwick v. Cohen*, 319 F.Supp. 875 (N.D.Ohio 1970), is thoroughly undermined by the Supreme Court's decision in *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973). In that case the Court concluded that 15 U.S.C. § 1640 allows "imposition of a civil penalty in cases where no finance charge is involved but where a regulation requiring disclosure has been violated."

In light of the emphasis Congress placed on agency rule making and on private and administrative enforcement of the Act, we cannot conclude that Congress intended those who failed to comply with regulations to be subject to no penalty or to criminal penalties alone. As the District Court concluded, imposition of the minimum sanction is proper in cases such as this, *where the finance charge is nonexistent or undetermined.*

*Id.* at 376, 93 S.Ct. at 1664 (emphasis added). *See also Sellers v. Wollman*, 510 F.2d 119, 123 (5th Cir.1975); *Palmer v. Wilson*, 359 F.Supp. 1099, 1104 (N.D.Cal.1973), *vacated*, 502 F.2d 860 (9th Cir. 1974).

7.  15 U.S.C. § 1637, entitled "Open end consumer credit plans—Required disclosures by creditor," reads in relevant part as follows:
    *Statement required with each billing cycle*
        (b) The creditor of any account under an open end consumer credit plan shall transmit to the obligor, for each billing cycle at the end of which there is an outstanding balance in that account or with respect to which a finance charge is imposed, a statement setting forth each of the following items to the extent applicable:

    .   .   .   .   .

        (2) The amount and date of each extension of credit during the period, and, if a purchase was involved, a brief identification (unless previously furnished) of the goods or services purchased.

8.  15 U.S.C. § 1640(a) provides:
        (a) Except as otherwise provided in this section, any creditor who fails in connection with any consumer credit transaction to disclose to any person any information required under this part to be disclosed to that person is liable to that person in an amount equal to the sum of
        (1) twice the amount of the finance charge in connection with the transaction, except that the liability under this paragraph shall not be less than $100 nor greater than $1,000; and
        (2) in the case of any successful action to enforce the foregoing liability, the costs of the action together with a reasonable attorney's fee as determined by the court.

9.  The district court read the following section of the legislative history to restrict the right to sue under the Act to debtors financially harmed or otherwise prejudiced in securing credit:
        While primary enforcement of the bill would be accomplished under the administrative enforcement section . . . , further provision is made for the institution of civil action by an *aggrieved debtor.*
    1968 U.S.Code Cong. & Admin.News at p. 1976 (emphasis added).

*Mourning* affirmed implicitly the position taken in *Ratner v. Chemical Bank New York Trust Co.*, 329 F.Supp. 270 (S.D.N.Y. 1971), as to congressional purpose:

> The scheme of the statute, as both sides agree, is to create a species of "private attorney general" to participate prominently in enforcement. The language should be construed liberally in light of its broadly remedial purpose. Thus construed, it plainly encompasses this suit. As plaintiff demonstrates in detail, but this court finds it sufficient to note briefly, the omission with which defendant is charged occurred "in connection with [a] consumer credit transaction . . . ." The fact that there was no finance charge *at the time* of the omission is of no consequence. *The fact that there might never be one* (i. e., if despite defendant's invitation to pay only $10 and incur a finance charge, plaintiff paid the whole balance and incurred none) *is also unimportant*, as is the fact that plaintiff actually did thereafter incur and pay such a charge [emphasis added]. It is sufficient for present purposes that (1) there was a readily knowable "finance charge in connection with the transaction," and (2) this relatively trivial detail serves, after all, not as the *ground for liability* but merely as the initial step in what defendant accurately calls the statute's "sole measure of damages."
>
> Beyond using the finance charge as such an available and handy reference point, presumably to be replaced in the normal case by the $100 minimum or $1,000 maximum, Congress made clear its broader scheme, and broader system of reimbursement, for private enforcement. It invited people like the present plaintiff, *whether they were themselves deceived or not*, to sue in the public interest [emphasis added]. Following familiar precedents, it encouraged such actions by providing, in addition to the incentive of public service, costs and a reasonable attorney's fee above the minimum recovery of $100. Cf. *Newman v. Piggie Park Enterprises*, 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968).

*Id.* at 280–81 (footnote omitted).

Under the Truth in Lending Act as explicated above, we are convinced that White was "adversely affected" or "aggrieved" within the standing requirements as developed in *Linda R. S. v. Richard D.*, 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973); *Trafficante v. Metropolitan Life Insurance Co., 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972); Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); and *Data Processing Service v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

In *Linda R. S., supra*, the Court, while recognizing clearly that Congress may not confer jurisdiction on Article III courts to render advisory opinions,[10] noted that Congress may "enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute." *Id.* at 617 n. 3., 93 S.Ct. at 1148. *See also O'Shea v. Littleton*, 414 U.S. 488, 493 n. 2, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). We conclude that in the disclosure requirements of the Truth in Lending Act Congress created precisely the type of statutory right discussed in *Linda R. S., supra*.

The Act creates specific duties in creditors and specific rights to information in debtors, and in 15 U.S.C. § 1640 provides that any creditor who breaches his statutory duty will be subject to suit by the debtor for enforcement of his *rights to the information*. It is essential to note that Congress in creating this statutory scheme did not impose simply a general duty of "adequate disclosure" upon creditors and provide for suit only by debtors able to show that they were "aggrieved" by the creditor's inadequate performance. Rather, Congress gave the debtor a right to specific information and therefore defined "injury in fact" as the failure to disclose such information. *Compare Trafficante, supra.* Cf. *Robles v. EPA*, 484 F.2d 843 (4th Cir. 1973).

---

**10.** *See Muskrat v. United States*, 219 U.S. 346, 31 S.Ct. 250, 55 L.Ed. 246 (1910).

We believe that under the above analysis that neither the absence of any service charges nor the failure of Korvettes' practices to deceive White,[11] relied on by the district judge, deny White standing to sue under the Act.

The district court also noted that White failed to show any need for further information in order to allow him to shop effectively for credit. Clearly, the chief purpose of the Act is to make such comparison shopping possible, but that is not the exclusive purpose. The Act is also a "disclosure law" intended to protect the public from false and fictitious charges and to thus avoid "the uninformed use of credit." 15 U.S.C. § 1601. *See also* 1968 U.S.Code Cong. & Admin.News at p. 1963. We conclude that the district court's focus on the legislative purpose was too narrow and that the Act's disclosure requirement is clear. We therefore, hold that White had standing to sue under the Act.[12]

### III.

■ The district court concluded that the identification of goods or services provided by Korvettes to White at the time of purchase satisfied the disclosure requirements of the Act. It based its decision on these findings of fact: (1) the 12 transactions included purchases of "clothing, slide projector trays, photographic prints, light bulbs, phonograph records and toys;" (2) the clothing was identified on the charge slips as "Apparel" and the other purchases were identified as "Hard Goods;"[13] (3) White was able to identify all but two of these purchases at the time his deposition was taken many months later; (4) White or his wife knew what had been purchased on each occasion at the time the relevant bill was paid; and (5) the imprinted terms supplied were sufficient to allow White to decide whether to pay his bill at once or defer payment under the credit terms available.[14]

We agree with White that the district court erroneously construed the disclosure requirements of the Act, 15 U.S.C. § 1637(b)(2). It is agreed that the identification requirement was not met by the monthly billing statement, which showed only the date and amounts of purchases. Nor was it met by Korvettes' practice of furnishing the charge slip and cash register tape[15] at the time of purchase because neither identified the goods purchased.[16] As we have previously noted, "Apparel" and "Hard Goods" designations meant nothing. Unless the customer remembered, he could not know whether he had bought gourmet foods or auto accessories.[17] We hold that

---

**11.** In *Ratner, supra*, Judge Frankel stated that the Act "invited people like [Ratner], whether they were themselves deceived or not, to sue in the public interest." 329 F.Supp. at 280 (footnote omitted). In a footnote accompanying this quoted material, he explained that plaintiffs in these cases are realistically "likely to be people not easily or actually deceived." *Id.* at 280 n. 16.

**12.** The district court also held that no credit had been extended by Korvettes to White. This conclusion is erroneous under the definition of "credit" in the Truth in Lending Act: "The term 'credit' means the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." 15 U.S.C. § 1602(e).

**13.** 374 F.Supp. at 159.

**14.** 374 F.Supp. at 160 & n. 9.

**15.** Korvettes' counsel at oral argument on appeal stated that a series of numbers or Roman numerals appearing on the cash register tapes revealed further identifying information when decoded. However, there is no evidence that Korvettes furnished White or any other customer the relevant code as part of the original purchase or the billing statement.

**16.** We do not decide the question of whether the disclosure requirements of the Act may be satisfied by identification provided at the time of purchase instead of at time of billing. Assuming either time satisfies the Act, it is clear here that adequate identification was furnished neither at time of purchase nor later.

**17.** At the trial of this case in the district court, portions of White's deposition, taken on November 8, 1972, were read into the record by Korvettes' counsel. As part of that deposition, he was asked to recall, if possible, what items were purchased by him and his wife on each of the twelve dates relevant to this case. It was apparently on the basis of these recollections that the district court found the twelve transactions to include purchases of "clothing, slide projector trays, photographic prints, light

the designations "Hard Goods" and "Apparel" as applied to the purchases made by White did not provide "a brief identification . . . of the goods or services purchased."

## IV.

The district court found that the first two of the 12 transactions involved in this case were rescinded when White's wife returned the items purchased and received a full refund.[18] With respect to the final two purchases, the court found that White complained of the quality of the goods and services provided, refused to pay the bill, and attempted to repudiate the transaction, stating that if sued he would defend on the grounds that he received "poor merchandise." The court, relying on *Bostwick, supra,* concluded that White could not recover on any of these four transactions since "rescinding customers are not within the class of persons which the civil liability provisions of the Act seek to protect." 374 F.Supp. at 158. We believe with the Fifth and Ninth Circuits that *Bostwick* was wrongly decided and this position is untenable. *Sellers v. Wollman, supra; Eby v. Reb Realty, Inc.,* 495 F.2d 646 (9th Cir. 1974); *Palmer v. Wilson, supra.*

But that is not the end of the matter. Although we hold the remedies are not mutually exclusive and that election is not required, it does not necessarily follow that

in every such case the buyer is entitled to both rescind and recover the statutory damages for failure to disclose. In each of the cited cases, recision was effectuated under the Act, 15 U.S.C. § 1635, which creates a right of recision as to certain transactions, not including open end consumer credit plans of the type involved in this case. Where both remedies are made available by the Act, legislative intent to permit both in the same case is easier to discern. *See Sellers v. Wollman, supra* at 123; *Eby v. Reb Realty, supra* at 651–52. We leave open the question whether a buyer who rescinds *all* purchases is entitled to recover for nondisclosure. Such a situation may present possibility of abuse. Enabling one who makes no final purchase, expends no money, and incurs no finance charge or interest to recover from a nondisclosing dealer may go beyond the intent of Congress in enacting this legislation.[19]

But that is not our case. Here, whatever White's motivation, the transactions were genuine, and it matters not, we think, that two out of 12 transactions are in dispute and two others rescinded.

We reverse and remand with instructions that judgment will be entered for White on all counts and that costs and reasonable attorney's fees[20] as determined by the district court be awarded.

*Reversed and remanded.*

---

bulbs, phonograph records and *toys.*" 374 F.Supp. at 159 (emphasis added).

When asked what he had purchased on December 16, 1971, White responded that his wife had made that purchase and that he could only venture a guess as to the nature of the purchase. When asked further for his "best recollection" he stated:

Okay. Looking at the date and looking at the calendar that I have here, which shows that Hanukkah started . . . on December 15, I would say that some of these items are *probably toys,* and perhaps it's all on one tape. I don't know but *perhaps everything was toys on there.* If that is not so, I really don't know.

App. 224 (emphasis added).

That purchase was identified on the charge slip as "*Apparel.*" App. 30.

**18.** Both a charge and a credit appeared on the billing statement for each returned item. App. 33.

**19.** In an analogous situation where Congress anticipated the possibility of unjust enrichment, it made clear that a civil penalty should not be awarded:

[T]he bill specifically exempts credit advertising from the application of civil penalties. This exemption has been written into the bill by your committee to avoid the possibility that anyone, *not a party to an actual transaction,* seeing an advertisement not complying with the disclosure requirements of the bill would attempt to seek civil penalties.

1968 U.S.Code Cong. & Admin.News at 1976 (emphasis added).

**20.** We note that White appeared pro se in the district court. Since the question was not presented below, and has not been briefed on

## SUPPLEMENTAL OPINION ON PETITION TO REHEAR

### PER CURIAM:

In its petition for rehearing, Korvettes expresses concern that our opinion will outlaw designations such as "apparel" and "hard goods" even though accurately affixed to goods purchased. That was not the nature of the system used by Korvettes. As we made clear in our opinion,

> [f]or purchases made through central checkout, items were identified either as "Apparel" or "Hard Goods" or more specifically depending *not* on the nature of the goods bought at these locations but on which of these two identifications happened to be permanently affixed to the imprinters used for charge card transactions at the checkout center selected by the customer. In short, the designation meant nothing except that the customer had fortuitously picked a particular checkout register.

At p. 647 (footnotes omitted).

It was the arbitrary nature of Korvettes' system that was presented by this appeal. For example, White's best recollection of purchases made on December 16 was:

> Okay. Looking at the date and looking at the calendar that I have here, which shows that Hanukkah started on December 15, I would say that some of these items are *probably toys*, and perhaps it's all on one tape. I don't know but *per-haps everything was toys on there*. If that is not so, I really don't know.

App. 224 (emphasis added). Those purchases were identified on the charge slip as "Apparel." App. 30.

We intimate no opinion as to whether the labels "hard goods" and "apparel" would satisfy the Act if properly affixed to the goods they identify.

We agree with Arlen Realty that the amendment to the Act, 15 U.S.C. § 1640(g), which was not previously brought to our attention, makes it clear that White is entitled to a statutory recovery totaling $100 for the multiple violations involved in this case, and we so hold.

Except as modified, we adhere to our prior opinion.

BOREMAN, Senior Circuit Judge, dissented.

appeal, we intimate no opinion whatsoever as to whether or not one who appears pro se is entitled to counsel fees.

In *Bone v. Hibernia Bank*, 354 F.Supp. 310 (N.D.Cal.1973), *rev'd on other grounds*, 493 F.2d 135 (9th Cir. 1974), the district judge simply asserted, without analysis, that "[i]t is well settled" that one who appears pro se is not entitled to counsel fees. We believe the authorities cited are insufficient to establish such an absolute rule. One of the two cases employed by the district judge directly supports his statement. The other does so by analogy in that it denies attorney's fees to a party repre-sented by the Legal Aid Society. We believe that second case is wrongly decided. *Tillman v. Wheaton-Haven Recreation Ass'n, Inc.*, 517 F.2d 1141, 1147–48 (4th Cir. 1975). *See also Sellers v. Wollman, supra* at 123. There are many cases, *e. g., Miller v. Amusement Enterprises, Inc.*, 426 F.2d 534 (5th Cir. 1970) that award counsel fees in fact situations falling outside the traditional attorney-client relationship.

We believe the question of attorney's fees in this case is an open one—ultimately dependent upon analysis of congressional purpose.